Philip E. and Joan BAUER, Federal Meat Co. and Phillip and Ruth Himmelfarb, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 83–7422.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 4, 1984.

Decided Dec. 7, 1984.

As Amended Jan. 4, 1985.

---

Cameron Williams, Gerald H. Granof, Tyre, Kamins, Katz & Granof, Los Angeles, Cal., for petitioners.

Murray Horwitz, Tax Div., Dept. of Justice, Washington, D.C., for respondent.

Before CHAMBERS, HUG, and BOOCHEVER, Circuit Judges.

HUG, Circuit Judge:

This case concerns a determination of whether cash payments by two stockholders to their wholly-owned corporation were loans or contributions to capital. The Commissioner of Internal Revenue contended that the payments by the stockholders were contributions to capital and not loans, as the stockholders and the corporation maintained. The documentation between the parties and the books of the corporation reflected the cash payments as loans and the periodic payments by the corporation as principal and interest payments to the stockholders. The corporation deducted the interest payments and the stockholders declared the interest payments as income and treated the principal payments as a return of capital. The Commissioner contended that because the stockholders' cash advances to the corporation were contributions to capital and not loans, the corporation could not deduct the claimed interest and the stockholders were required to treat the payments made to them as taxable dividends. The Commissioner assessed deficiencies accordingly. The stockholders and the corporation contested the assessments in the Tax Court and the cases were consolidated for trial. The Tax Court held for the Commissioner in each instance. On appeal, the sole issue is whether the Tax Court was clearly erroneous in holding that the stockholders' cash advances to the corporation were capital contributions rather than loans. We reverse.

## FACTS

The parties entered into a stipulation of facts, which we summarize here.

Philip Bauer and his father-in-law, Phillip Himmelfarb, are officers and sole stockholders of the Federal Meat Company ("Federal"). They formed Federal in 1958 with paid-in capital of $20,000. The initial and only stock issuance was 2,000 shares, of which Bauer owns 25 percent and Himmelfarb 75 percent. Federal is a custom slaughterer in the business of selling dressed meat to chain store buyers, retailers, and wholesalers. It buys live animals and has them custom slaughtered for fixed fees. Federal does not own a packing house, and it leases its premises and delivery equipment.

Since Federal's incorporation, and continuing throughout the years at issue, Bauer and Himmelfarb advanced various amounts of money to Federal. By the end of the calendar year 1958, a total of $102,650 had been advanced by Bauer and Himmelfarb. Numerous advances and repayments then occurred so that as of December 31, 1972, the net balance advanced by Bauer and Himmelfarb totaled $810,068. The amounts of the advances and repayments of principal during the years in question are reflected in the table below:

| Date | Amounts advanced by Bauer to Federal | Amounts repaid by Federal to Bauer |
|------|------|------|
| July 20, 1973 | $ 80,000 | $ — |
| July 23, 1973 | 20,000 | — |
| July 23, 1973 | — | 30,000 |
| August 24, 1973 | 35,000 | — |
| December 28, 1973 | — | 35,000 |
| January 2, 1974 | — | 25,000 |
| July, 1974 | 35,000 | — |
| January, 1975 | — | 30,000 |
| March, 1975 | 5,000 | — |
| March, 1975 | — | 5,000 |
| July, 1975 | 65,000 | — |
| July, 1975 | 30,000 | — |
| Total | $270,000 | $125,000 |

| Date | Amounts advanced by Himmelfarb to Federal | Amounts repaid by Federal to Himmelfarb |
|------|------|------|
| July 20, 1973 | $170,000 | $ — |
| June 6, 1975 | 250,000 | — |
| July 11, 1975 | 350,000 | — |
| December 10, 1975 | 200,000 | — |
| December 31, 1975 | — | 75,000 |
| Total | $970,000 | $ 75,000 |

The parties treated all of the transactions as loans and repayments. Each advance to Federal was evidenced by a negotiable promissory note that was unsecured and was payable on demand. The notes carried a seven percent interest rate during 1972–1974 and a ten percent interest rate in 1976. The notes were not convertible into stock, nor were they subordinated to any other obligation. For each advance made to Federal, an amount representing "accrued interest payable" was entered in the corporate ledger at the end of each month as an addition to liabilities in the form of "outstanding loans payable-officers." Each year's total of accrued interest was paid within two and one-half months of the close of Federal's fiscal year. On its financial statements, Federal included the outstanding balances as a current liability labeled "loan payable-officers."

On its corporate federal income tax returns for the years at issue, Federal claimed interest expense deductions in the amounts of $79,638, $103,506, and $103,007, for its fiscal years ending April 30 of 1974, 1975, and 1976, respectively, for the amounts paid as interest to Bauer and Himmelfarb. These amounts, in turn, were reported by Bauer and Himmelfarb as interest income in the calendar year in which they were received. The amounts received from Federal characterized as loan principal repayments were not reported as income. These amounts for Bauer were: $65,000 in 1973, $25,000 in 1974, and $35,000 in 1975; for Himmelfarb, the amount was $75,000 in 1975. Bauer and Himmelfarb each received a yearly salary of $70,000 or $80,000. Federal has never paid dividends; the earnings of the corporation from its inception in 1958 were retained and reinvested to meet the continued growth of the corporation. By the end of the fiscal years in issue, the retained earnings were: 1974, $634,107; 1975, $657,973; and 1976, $486,092. (In the 1976 fiscal year, Federal suffered a net loss).

The Tax Court concluded that the advances by Bauer and Himmelfarb to Federal were capital contributions and disallowed the interest deductions claimed by Federal on the ground that no debtor-creditor relationship was established to support treatment of the payments as interest. In addition, the principal payments made by Federal to Bauer and Himmelfarb were held to be taxable dividends.

The deficiencies upheld by the Tax Court were as follows:

| Petitioner | Taxable Year Ended | Deficiency |
|------|------|------|
| Phillip E. Bauer an Joan Bauer | December 31, 1973 | $32,387.00 |
|  | December 31, 1974 | 12,423.00 |
|  | December 31, 1975 | 12,557.00 |
| Phillip Himmelfarb and Ruth Himmerfarb | December 31, 1975 | $43,824.00 |
| Federal Meat Company | April 30, 1974 | $37,195.00 |
|  | April 30,1975 | 49,683.39 |
|  | April 30, 1976 | 38,676.32 |

## STANDARD OF REVIEW

We have held that the question of whether an advance to a corporation is debt or equity is "primarily directed at ascertaining the intent of the parties." *A.R. Lantz Co. v. United States*, 424 F.2d 1330, 1333 (9th Cir.1970). We stated that this determination is a question of fact, "which, when once resolved by the district court, cannot be overturned unless clearly erroneous." *Id.* at 1334. This rule applies to factual inferences from undisputed basic facts and the identical weight is attached to these findings by the Tax Court. *Commissioner v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218 (1960).

## ANALYSIS

The determination of whether an advance is debt or equity depends on the distinction between a creditor who seeks a definite obligation that is payable in any event, and a shareholder who seeks to make an investment and to share in the profits and risks of loss in the venture. *A.R. Lantz Co.*, 424 F.2d at 1334. The outward form of the transaction is not controlling; rather, characterization depends

on the taxpayer's actual intent, as evidenced by the circumstances and conditions of the advance. *Id.* at 1333–34.

■ In 1969, Congress authorized the Secretary of the Treasury to prescribe regulations setting forth the factors to be considered in determining whether an advance is debt or equity. 26 U.S.C. § 385. The Secretary did not issue such regulations until 1982, and those regulations apply only to obligations issued in 1983 or later. *See* 26 C.F.R. § 1.385–1–10. Here we must still be guided by the case law and by the five factors that Congress suggested, as part of the 1969 statute, might be included in the regulations.[1] This court has identified eleven factors:

> (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; and (11) the ability of the corporation to obtain loans from outside lending institutions.

*A.R. Lantz Co.*, 424 F.2d at 1333. No one factor is controlling or decisive, and the court must look to the particular circumstances of each case. *Id.* "The object of the inquiry is not to count factors, but to evaluate them." *Tyler v. Tomlinson*, 414 F.2d 844, 848 (5th Cir.1969). The burden of establishing that the advances were loans rather than capital contributions rests with the taxpayer. *O.H. Kruse Grain & Milling v. Commissioner*, 279 F.2d 123, 125 (9th Cir.1960).

## A. *Ratio of Debt to Equity*

■ In the present case, the Tax Court gave great weight to the eighth factor: whether Federal was adequately capitalized. The court found that Federal's debt-to-equity ratio was as high as 92 to 1 during the years in question and that Federal was seriously undercapitalized. The Tax Court found this to be a strong indication that the advances were capital contributions rather than loans. The Tax Court apparently based its finding of a debt-to-equity ratio of 92 to 1 on a paragraph of the Stipulation of Facts signed by the parties. That paragraph states:

> The ratio of stockholder debt to corporate stock was approximately 92 to 1 for the fiscal year ending April 30, 1976.

This is accurate insofar as it compares the ending debt owed to the stockholders in 1976 of $1,850,067 to their initial stock purchase in 1958 of $20,000. This is not a true or meaningful debt-to-equity ratio. First, it completely ignores the earnings that had been retained in the corporation as it grew over the 18-year period. The stockholders' equity in a corporation is composed not only of the paid-in-capital, but also of the profits that have been generated and retained in the corporation as "retained earnings." Thus, if the debt-to-equity ratio were considered to be a comparison of stockholder loans to the correct calculation of stockholder equity including retained earnings in the corporation, this "debt-to-equity" ratio would be only 1.5 to 1 in 1974–1975 and 3.6 to 1 in 1976, as hereinafter shown.

The more meaningful debt-to-equity ratio compares the total liabilities to the stockholders' equity. The stockholders' equity would include both the initial paid-in capital and the retained earnings. Basically, the

---

**1.** 26 U.S.C. § 385(b) provides that the factors set forth in the regulations may include, among other factors:

> (1) whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest,

> (2) whether there is subordination to or preference over any indebtedness of the corporation,
> (3) the ratio of debt to equity of the corporation,
> (4) whether there is convertibility into the stock of the corporation, and
> (5) the relationship between holdings of stock in the corporation and holdings of the interest in question.

stockholders' equity is the difference between the assets and liabilities of the corporation.

Congress recognized this as the appropriate method of calculating the debt-to-equity ratio in enacting section 385.

> The debt-equity ratio of the issuing corporation for purposes of this test generally is determined by comparing the corporation's total indebtedness with the excess of its money and other assets over that indebtedness.

S.Rep. No. 552, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Ad. News 1645, 2027, 2172. The calculation of Federal's debt-to-equity ratio for the years in question would therefore be as follows. In our view, the total debt-to-equity ratio is the appropriate ratio to review in determining whether a corporation is too thinly capitalized; however, we also show the stockholder debt-to-equity ratio for illustrative purposes.

|  | 1974 | 1975 | 1976 |
|---|---|---|---|
| Current Assets | $1,971,718 | $2,535,266 | $4,190,795 |
| Fixed and Other Assets | 92,992 | 95,651 | 195,939 |
| Total Assets | $2,064,710 | $2,630,917 | $4,386,734 |
| Stockholders Loans | $1,025,067 | $1,030,067 | $1,850,067 |
| Other Liabilities | 385,536 | 922,877 | 1,030,575 |
| Total Liabilities | $1,410,603 | $1,952,944 | $3,880,642 |
| Outstanding Stock | $ 20,000 | $ 20,000 | $ 20,000 |
| Retained Earnings | 634,107 | 657,973 | 486,092 |
| Total Stockholder Equity | $ 654,107 | 677,973 | 506,092 |
| Total Liabilities and Capital | $2,064,710 | $2,630,917 | $4,386,734 |

### Total Debt-to-Equity Ratio

1974: $1,410,603 divided by $654,107 = 2.15 to 1

**2.** The regulations adopted in 1982 interpreting section 385 refine the definition of stockholders' equity and the calculation of these debt-to-equity ratios, but basically the method is the same. *See* 26 C.F.R. § 1.385–6(g). In fact, if the methods prescribed in the regulations were used, the ratios would be even more favorable to the taxpayer because trade accounts payable would be excluded from total liabilities and the net loss for the year in 1976 would be added back to the stockholders' equity for that year. *See* 26 C.F.R. § 1.385–6(g).

The calculations for 1976 would then be as follows:

#### Total Debt-to-Equity Ratio

| Total Liabilities | Stockholders Equity | Ratio |
|---|---|---|
| $3,880,642 | $506,092 | |
| 372,401 (Trade A/P) | +155,517 (Net Loss) | |
| $3,508,241 divided by | $661,609 | = 5.30 to 1 |

1975: $1,952,944 divided by $677,973 = 2.88 to 1

1976: $3,880,642 divided by $506,092 = 7.66 to 1

### Stockholder Debt-to-Equity Ratio

1974: $1,025,067 divided by $654,107 = 1.56 to 1

1975: $1,030,067 divided by $657,973 = 1.56 to 1

1976: $1,850,067 divided by $506,092 = 3.65 to 1

Thus, during the years in question, the total debt-to-equity ratio, as reflected on the books of the corporation, was not 92 to 1, but ranged from a little over 2 to 1 to less than 8 to 1. The stockholder debt-to-equity ratio during those years was a minimum of 1.5 to 1 and a maximum of 3.6 to 1.[2]

The purpose of examining the debt-to-equity ratio in characterizing a stockholder advance is to determine whether a corporation is so thinly capitalized that a business loss would result in an inability to repay the advance; such an advance would be indicative of venture capital rather than a loan. *Gilbert v. Commissioner,* 248 F.2d 399, 407 (2d Cir.1957). Essentially, we are concerned with the degree of risk the loan presents to the lender and whether an independent lender, such as a bank, would be willing to make the loan. In addition to the numerical debt-to-equity ratio, other factors in the financial picture would also be important to an independent lender in analyzing the risk. Federal's history was that

#### Stockholder Debt-to-Equity Ratio

Stockholder Debt-to-Equity

| $1,850,067 | divided by $661,609 | = 2.79 to 1 |
|---|---|---|

It is worth noting that these regulations provide for a "safe harbor" within which a corporation's debt is not considered to be excessive. 26 C.F.R. § 1.385–6(f)(3) provides that a corporation's debt is not excessive if the corporation's "outside ratio" (which is equivalent to the total debt-to-equity ratio above) is less than 10 to 1, and the corporation's inside ratio (which is equivalent to the stockholder debt-to-equity ratio above) is less than 3 to 1. Thus, Federal's ratios of 5.30 to 1 and 2.79 to 1 as calculated under the regulations are within the "safe harbor" of 10 to 1 and 3 to 1, and under these regulations the corporation's debt would not be excessive.

of a successful company whose increasing cash needs arose from growth, not a lack of profits or business reverses. Federal had virtually no fixed assets; its plant and equipment were leased. The assets were principally current assets which could be quickly turned into cash. At all times during the years in question, Federal's current assets exceeded all liabilities by at least $300,000, which presents a strong financial picture.

Federal's financial structure and these other factors indicate that Federal could readily have obtained a loan from a bank or other financial institution for the purpose for which the stockholders' loans were made, which was to finance inventory and accounts receivable. There is specific evidence in this case that one bank would have been willing to make these loans. In a letter from a vice president of Bank of America that was attached to the Stipulated Facts, the officer noted that it had dealt with Federal and was familiar with Federal's financing during the years in question and the bank was "ready to make bank loans for those amounts of officers' loans and/or more if Federal Meat Co. desired to use bank financing." The bank officer also noted that "in the event Federal wanted to liquidate during this period, Federal would have paid off its creditors, the bank, the officers' loans from conversion of its meat inventory, and accounts receivable within a three to four week cycle most likely without any need of selling the small amount of fixed assets."

Neither the numerical debt-to-equity ratio nor other factors in the analysis of the corporation's financial structure justify a conclusion that the advances should be characterized as venture capital rather than loans.

B. *Proportional Holdings of Debt and Equity*

The Tax Court also gave weight to the alleged fact that Bauer and Himmelfarb had loaned Federal amounts that were roughly proportional to their respective capital investments. The court found that during the years in question Himmelfarb had advanced a total of $970,000 to Federal while Bauer had advanced $270,000, a ratio of about 3½ to 1 as compared to the 3 to 1 ratio of their stockholdings. We agree that where a stockholder owns "debt" in the same proportion to which he holds stock in a certain corporation, the characterization as "debt" may be suspect. *See Gilbert,* 248 F.2d at 407. However, the Tax Court clearly miscalculated the amounts of Bauer's and Himmelfarb's advances to Federal.

The Tax Court looked only at the gross amount of Bauer and Himmelfarb's advances during the years in question. It failed to consider either the amount of the loans outstanding at the beginning of the three-year period or the effect of the repayments that Federal made during this period. At the beginning of the three-year period, Federal already owed $805,068 to Himmelfarb, but only $5,000 to Bauer. At the end of the period, the figures had grown to $1,700,068 and $150,000, a ratio of about 11 to 1. Even if the three-year period is considered in isolation—an approach that makes little sense given that the stockholders had been making loans to Federal since 1958—the *net* amounts advanced by Himmelfarb and Bauer during that period were $895,000 and $145,000, respectively, a ratio of about 6 to 1. These figures simply will not support a finding that Bauer and Himmelfarb made advances to Federal in proportion to their capital investments.

C. *Other Factors*

The Tax Court also found it significant that all of Federal's shareholder debt was evidenced by demand notes with no fixed date of maturity. Although some repayments were made during the years in question, repayments never kept up with advances. We agree that lack of a fixed date of maturity on the debt instruments, together with continual growth of the debt, may suggest that there is no intention to make full repayment. But that one factor is not enough to carry the entire weight of this case. Many other factors favor the petitioners, as the Tax Court conceded: the existence of notes; fixed and reasonable interest rates; actual timely payment of interest; corresponding treatment of the

interest as income by Bauer and Himmel-farb; the cash-flow demands of the custom slaughter business; and the lack of subordination of shareholder debt to other corporate debt. Additionally, this court concludes that Federal's ratio of debt to equity was within reasonable bounds and that Bauer and Himmelfarb did not own debt in proportion to their stockholdings.

## CONCLUSION

The Tax Court erred in the basis of its calculation of Federal's debt-to-equity ratio. In reviewing the actual debt-to-equity ratio and the current assets in relation to the liabilities, and considering the general strength of the corporate financial picture, there is no reason to justify a conclusion that the loans were in fact "venture capital." Also, the record does not support the Tax Court's finding that Bauer and Himmelfarb made advances to Federal in rough proportion to their stockholdings. The documentation and the accounting procedures followed support the taxpayers' contention that the advances were loans. For these reasons and the other reasons above specified, we hold that the Tax Court's recharacterization of Federal's debt as equity is clearly erroneous, and the decision of the Tax Court is therefore REVERSED.