# United States Tax Court

T.C. Memo. 2023-35

ARLAND T. KEETON a.k.a. ARLAND KEETON AND IMA JEAN
KEETON,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 1358-21.                          Filed March 16, 2023.

————

*William L. Ghiorso*, for petitioner.

*Catherine J. Caballero*, *Catherine S. Tyson*, and *Nhi T. Luu*, for
respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*:  With respect to petitioners' Federal income tax
for 2017 and 2018 the Internal Revenue Service (IRS or respondent) de-
termined deficiencies of $119,471 and $104,479, respectively, plus accu-
racy-related penalties.[1]  The principal question is whether petitioners
are entitled to a passthrough loss deduction and a carryover net operat-
ing loss (NOL) deduction claimed on their 2017 and 2018 returns, re-
spectively, corresponding to their allocable share of a business bad debt
deduction reported by a partnership of which they were members.  We
sustain respondent's disallowance of the claimed passthrough loss and

---

[1] Unless otherwise indicated, all statutory references are to the Internal Reve-
nue Code (Code), Title 26 U.S.C., in effect at all relevant times, all regulation refer-
ences are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all
relevant times, and all Rule references are to the Tax Court Rules of Practice and Pro-
cedure.  We round most monetary amounts to the nearest dollar.

[*2] NOL deductions, finding that petitioners failed to prove the existence of a bona fide debt. We likewise sustain the penalties.

FINDINGS OF FACT

The following facts are derived from the pleadings, four Stipulations of Facts with attached Exhibits, and the documents and testimony admitted into evidence at trial. Petitioners resided in Oregon when their Petition was timely filed.

A.   *Keeton-Riemenschneider, LLC*

The putative obligee on the alleged debt is Keeton-Riemenschneider, LLC (KRLLC), which is treated as a partnership for Federal income tax purposes.[2] KRLLC was formed in 1992 by petitioners and Robert and Lorene Riemenschneider. At all relevant times each couple owned 50% of KRLLC. Robert Riemenschneider was the president of the company, and petitioner husband was its secretary. Petitioner wife initially served as its main bookkeeper. KRLLC's records show petitioners' home address as its principal place of business.

According to a 1996 operating agreement, KRLLC was formed to "invest in various real estate and farming projects." Its 2015–2020 tax returns list "equipment rental" as its principal business. Regardless of its stated purpose, KRLLC was essentially inactive during 2015–2018. Its 2015 return shows a single item of income—$30,778 from "forgiveness of debt"—and a single item of expense—$1,638 from "depletion." Its 2016–2020 returns reflect no business operations and report no income of any kind.

B.   *Idaho Waste Systems, Inc.*

The putative obligor on the alleged debt is Idaho Waste Systems, Inc. (IWS), an Idaho C corporation incorporated in 1994 to operate a landfill south of Boise. Most of the waste IWS accepted for processing at its landfill came from demolition and construction projects.

---

[2] Neither party contends that KRLLC was subject to the audit procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA). *See* §§ 6221–6234 (as in effect for years before 2018). KRLLC, which appears to have qualified for small partnership status, checked a box on its 2017 return indicating that it was not electing to have TEFRA procedures apply. *See* § 6231(a)(1)(B).

**[*3]** The stock certificates show that petitioners and the Riemenschneiders each held 138 shares, or 34.5%, of IWS. The Riemenschneiders' children, Ron Riemenschneider and Rhonda Avery, owned 6% and 5% of IWS, respectively. An entity called Waste Not LLC, whose members were Pam McClain and Hayden Watson, owned 20% of IWS. The record does not reflect how (if at all) the latter two individuals were related to petitioners and the Riemenschneiders. Petitioners and the Riemenschneiders jointly controlled both KRLLC and IWS at all relevant times.

Petitioner husband and Robert Riemenschneider were the principal officers and directors of IWS until at least 2007. Ron Riemenschneider then became chiefly responsible for its day-to-day operations. Rhonda Avery, who had handled the books and records for IWS since the early 2000s, eventually took over for her brother. She managed IWS's operations until 2015.

C.    *Capitalization and Funding of IWS*

IWS was poorly capitalized from the outset and lacked reliable access to standard commercial financing. To fund its operations petitioners and the Riemenschneiders funneled cash to IWS through KRLLC. Petitioner husband, a sophisticated businessman, was engaged in numerous other ventures, including a successful construction company, a farming operation, and an aircraft leasing business. He and Robert Riemenschneider, acting through KRLLC, secured bank loans and advanced cash to IWS beginning in the mid-1990s. There was no promissory note or other debt instrument memorializing these advances.

Whenever IWS needed money, its bookkeeper, Rhonda Avery, contacted petitioner wife, KRLLC's bookkeeper, who arranged for checks to be sent to IWS in the requested amounts. The record reveals dozens of such requests for funds, in amounts ranging from $4,000 to $500,000, between 2001 and 2005. Ms. Avery often noted that IWS's bank accounts were overdrawn, explaining that it urgently needed funds to pay such basic expenses as employee payroll, purchases of equipment, repairs, insurance, and taxes.

KRLLC tracked its advances to IWS in a QuickBooks bookkeeping register captioned "Due from IWS." The register contains 112 entries beginning December 31, 1999. The first entry in the register, showing a credit of $3,331,093, is described as "Investment – Idaho Waste."

[*4] An entry for December 31, 2000, showing a credit of $264,372, is likewise captioned "Investment – Idaho Waste." Other credit entries for 1999–2000 are captioned "capital" or "equipment" or reflect the proceeds of bank loans. Beginning in 2001 most of the entries reflect cash advances to IWS, taking the form of checks written on KRLLC's bank accounts. Notwithstanding a few reductions, the balance shown as due from IWS steadily increased between 1999 and 2007, reaching an apex of $7,424,926 on December 31, 2007.

Under local law IWS was required to post a bond of $2.5 million with the State of Idaho to insure against the need for environmental remediation at the landfill. In August 2007 IWS entered into a $5 million financing arrangement with Premier West Bank (Premier West) under which the bank supplied the required bond and extended IWS a $2.5 million line of credit. As security for these undertakings IWS executed a deed of trust granting Premier West a security interest in the landfill property, which represented roughly 70% of IWS's total assets. IWS immediately began drawing down its new line of credit, and KRLLC advanced no additional funds to IWS after August 2007.

D.   *Purported Promissory Note*

On October 31, 2008, Robert Riemenschneider, in his capacity as president of IWS, executed a one-page document, purportedly a promissory note, captioned "Idaho Waste Systems, Inc." In this document IWS promises to pay KRLLC, "on demand," the sum of $3,222,076.89. The document states that IWS will pay "interest thereon at the rate of 9% per annum from October 31, 2008 until paid." The document specifies no repayment schedule, stating only that "[a]ny part hereof may be paid at any time."

On its yearend balance sheet for 2008, IWS reported an "N/P" (note payable) to KRLLC of $3,217,540. Neither that amount nor the larger amount shown on the purported promissory note can be reconciled with KRLLC's "Due from IWS" QuickBooks register. That register has no entries whatever for calendar year 2008. And the last entry for 2007 shows that the balance allegedly due from IWS was $7,424,926.

There is no evidence that IWS ever paid interest on the purported promissory note, at an annual rate of 9% or otherwise. KRLLC's "Due from IWS" register shows two interest payments from IWS (totaling $18,402) at yearend 2005 and one interest payment from IWS (of $8,390) at yearend 2007. The register shows no interest payments from IWS

[*5] after October 31, 2008, the date on which the purported promissory note was executed.

The purported promissory note specifies no collateral to secure repayment of principal or interest. There is no indication that KRLLC demanded any guaranty from any IWS shareholder. The document states only that, if demand for repayment were made, IWS would be responsible for reimbursing any collection-related attorney's fees that KRLLC might incur. No other enforcement mechanism for repayment appears on the face of the document.

E.     *IWS's Worsening Financial Condition*

IWS's financial statements show that it suffered consistent annual losses during 2008–2011, with corresponding negative impacts on its shareholder equity:

| Year | Profit or (Loss) | SH Equity |
|------|------------------|-----------|
| 2008 | ($973,310) | ($4,433,981) |
| 2009 | (263,508) | (4,697,489) |
| 2010 | (417,977) | (5,115,468) |
| 2011 | (331,995) | (5,447,463) |

In 2010 Premier West, suffering ill effects from the financial crisis, called in the $2.5 million line of credit. IWS could not repay the loan, and Premier West initiated foreclosure proceedings on the landfill property. IWS sought refinancing from other banks, but no bank was willing to extend credit.

IWS then turned to an existing creditor, Jack Yarbrough, who had developed an interest in the landfill operation. The "Due from IWS" register indicates that Mr. Yarbrough had lent money to IWS (or to KRLLC for the benefit of IWS) as early as December 2005. In mid-2010 Mr. Yarbrough agreed to extend to IWS a short-term loan of $4.2 million. IWS used part of the proceeds to satisfy its $2.5 million obligation to Premier West. On July 1, 2010, the bank accordingly assigned to Mr. Yarbrough its security interest in the landfill property.

The balance of the Yarbrough loan proceeds, or $1.7 million, was remitted to KRLLC. This action is reflected both on KRLLC's "Due from IWS" QuickBooks register and on its financial statements. The

[*6] QuickBooks register shows the balance due from IWS as being reduced by $1.7 million, to $2,128,696, as of May 6, 2010. IWS's December 31, 2010, balance sheet shows an "N/P" to KRLLC of $1,298,440, reduced from $3,052,440 at yearend 2009.

F.    *Conversion of Shareholder Loans to Equity*

The Yarbrough "bridge loan" was due to be repaid sometime in 2012. As the due date approached, IWS's shareholders perceived the need to present a strengthened capital structure to potential lenders, in the hope that they could induce a bank to refinance the Yarbrough loan. The shareholders accordingly agreed to convert their alleged loans to equity and to cancel all accrued interest on the loans.

This agreement was memorialized in a "Unanimous Written Consent in Lieu of Special Meeting" dated January 1, 2012. This document recites that, as of December 31, 2011, the shareholders had made loans to IWS in the aggregate of $2,666,219 and that these loans had accrued but unpaid interest in the aggregate of $5,719,174. The "note payable" to petitioners was said to be $679,329, and the "note payable" to the Riemenschneiders was said to be $995,546, yielding a total alleged loan of $1,674,875 from the owners of KRLLC.[3]

In the Unanimous Consent document the shareholders of IWS resolved that, "effective January 1, 2012, the liability for the notes payable shall be eliminated by converting the notes payable to paid in capital for each of the respective shareholders." They further resolved that, as of the same date, "the liability for accrued interest shall be eliminated and shall be shown as income to the corporation." The document states that these actions were "taken by unanimous written consent of all shareholders and directors of [IWS]." The document is signed by all of IWS's shareholders, including petitioners.

Consistently with the Unanimous Consent document, IWS's balance sheet at yearend 2012 reports no notes payable to shareholders and

---

[3] There is an unexplained difference of $60,218 between these amounts and the amounts shown on IWS's December 31, 2011, balance sheet. The balance sheet shows total notes payable to shareholders of $2,606,001, as opposed to $2,666,219 in the Unanimous Consent document. And the balance sheet shows that petitioners and the Riemenschneiders had aggregate notes payable of $1,614,657, with $1,298,440 due to KRLLC and $316,217 due to Robert Riemenschneider separately. The Unanimous Consent document, by comparison, shows the aggregate amount of such loans as $1,674,875.

[*7] no note payable to KRLLC. It records "additional paid-in capital" of $2,666,219, up from zero at yearend 2011. On the other hand, the actions the IWS shareholders took on January 1, 2012, are not reflected on the QuickBooks register in which KRLLC tracked the amount allegedly "Due from IWS." That register has no entries between May 6, 2010 (reporting a balance due of $2,128,696), and April 8, 2013 (reporting a balance due of $2,164,757).

G.    *Continued Downward Slide*

Despite conversion of all shareholder loans to equity, IWS was unable to obtain refinancing for the Yarbrough loan. During 2015 and 2016 it explored financing options with several institutions, including Park Place Equity and Lyon Capital. Petitioner husband conducted these negotiations in his alleged capacity as "president, founder and majority shareholder" of IWS. The term sheets for these proposed loans would have required guaranties from all shareholders who owned 20% or more of the company. None of these institutions ultimately agreed to extend credit.

Although Mr. Yarbrough deferred the due date for repayment of his loan several times, IWS ultimately defaulted. In 2017 Mr. Yarbrough instituted foreclosure proceedings against the landfill property, which served as collateral for the loan. An Idaho state court entered a judgment of foreclosure against IWS on May 25, 2018, and the property was sold in October 2018. IWS was essentially moribund thereafter.

H.    *Claimed Bad Debt Deduction*

The amount of the business bad debt deduction that KRLLC reported on its 2017 return was derived from its QuickBooks register, which purported to show the amount "Due from IWS." Entries on this register were made by various people at various times. Petitioner wife handled KRLLC's books and records until 2007. She made numerous entries on the register between 2001 and 2006, mostly showing cash transfers to IWS. Michael Holland, IWS's outside accountant and original tax return preparer, made yearend entries from 1999 through 2009, apparently based on computer printouts he received from IWS. Entries bearing his initials are all dated December 31; they typically refer to items described as investments, equipment, capital items, interest payments, adjusting entries, and reclassifications. Petitioners' daughter, Lynn Gilmore, who took over much of the bookkeeping from her mother in 2007, appears to have made several entries after 2009, including

[*8] those showing the $1.7 million remittance of Yarbrough loan proceeds in 2010.

The May 6, 2010, entry is the last entry on the "Due from IWS" register before the January 2012 debt-to-equity conversion. The alleged balance due as of May 6, 2010, was $2,128,696. There are no entries recorded during the remainder of 2010 or during 2011–2012. Three entries during 2013, all minor, reduced the alleged balance to $2,095,757 as of July 2, 2013. That is the penultimate entry on the register. The final entry, showing a balance due of zero, was recorded on December 31, 2017. It zeroes out the previous entry by recording $2,095,757 as a "bad debt loss."

For 2017 KRLLC filed a return on Form 1065, U.S. Return of Partnership Income. On line 22 of that return it reported an ordinary business loss of $2,095,757, wholly attributable to a $2,095,757 deduction claimed on line 12 for "bad debts." Schedule B–1, Information on Partners Owning 50% or More of the Partnership, which requests information about partners, showed petitioners and the Riemenschneiders as each owning 50% of KRLLC.

KRLLC issued to petitioners for 2017 a Schedule K–1, Partner's Share of Income, Deductions, Credits, etc., reporting an ordinary business loss of $1,047,878, corresponding to their 50% stake in the partnership ($2,095,757 × 0.5 = $1,047,878.50). On their Form 1040, U.S. Individual Income Tax Return, for 2017, petitioners reported that loss on Schedule E, Supplemental Income and Loss. By way of explanation they attached the following statement:

> An unsecured loan was made to an individual, Robert Riemenschneider. Keeton and Riemenschneider have had business and investment dealings in the past. Attempts were made to collect and a few payments were made. However, in 2016, Riemenschneider notified Keeton that he was filing for bankruptcy and payments stopped. . . . The remaining loan balance is no longer collectible.

This explanation was incorrect in at least three respects. First, the loan allegedly giving rise to the bad debt deduction was not made *to* Robert Riemenschneider. The alleged loan was made *by* the Riemenschneiders and petitioners, through KRLLC, to IWS. Second, KRLLC made no "attempts to collect" any loan. Petitioners have

[*9] stipulated that KRLLC "never made any formal or informal demand for repayment of any debt to IWS" and "did not take any actions against IWS to collect upon any outstanding loans." Third, there was no "remaining loan balance" as of 2017 because all loans extended to IWS by petitioners and the Riemenschneiders, directly or through KRLLC, were canceled and converted to equity on January 1, 2012.

The Schedule E loss reported on petitioners' 2017 return resulted in taxable income of negative $1,077,101 and zero tax due. On their return for 2018 petitioners claimed a carryover NOL deduction, likewise originating in the alleged bad debt loss, in excess of $1 million. The 2018 return also reported zero tax due.

KRLLC's 2017 return, as well as petitioners' 2017 and 2018 returns, were prepared by Jennifer Werner, a certified public accountant (CPA). She was employed by the same CPA firm as Mr. Holland and gradually took over for him, preparing returns for KRLLC and petitioners beginning in 2011 or 2012.

When seeking information for use in preparing the 2017 and 2018 returns, Ms. Werner did not communicate directly with petitioners. Rather, she communicated with their daughter, Ms. Gilmore, who had served as KRLLC's chief bookkeeper since 2007. Ms. Gilmore did not testify at trial.

As far as the record reveals, Ms. Werner based the $2,095,757 bad debt deduction solely on KRLLC's QuickBooks register, which showed an alleged balance "Due from IWS" in that amount as of December 31, 2017. Petitioners did not supply Ms. Werner, at the time she prepared the 2017 returns, with the January 2012 Unanimous Consent resolution by which petitioners and IWS's other shareholders agreed to convert all outstanding shareholder loans to equity.

On October 8, 2020, the IRS issued petitioners a timely notice of deficiency for 2017 and 2018. The notice included a copy of Form 886–A, Explanation of Items, issued to KRLLC, which disallowed the $2,095,757 bad debt deduction because "it was determined that a bona fide debt did not exist" between KRLLC and IWS. The notice accordingly disallowed $1,047,878 of the Schedule E loss deduction that petitioners had claimed for 2017—representing their 50% share of the partnership's reported loss—and all of the carryover NOL deduction ($1,066,001) that petitioners had claimed for 2018. The notice also made several computational adjustments that are not at issue.

**[\*10]** In consequence of these adjustments the notice determined deficiencies of $119,471 and $104,479 for 2017 and 2018, respectively. The IRS also determined accuracy-related penalties for both years of $23,894 and $20,895, respectively. The notice included a copy of a Civil Penalty Approval Form prepared by Revenue Agent (RA) Michael Balding on February 11, 2020. On that Form RA Balding recommended assertion, for each year, of a 20% penalty for "substantial understatement of income tax." *See* § 6662(b)(2), (d). The Form was digitally signed on February 11, 2020, by Joshua Cook, RA Balding's "immediate supervisor."

## OPINION

I.   *Burden of Proof*

The IRS's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). The taxpayer likewise bears the burden of proving entitlement to deductions allowed by the Code and of substantiating the amounts of any claimed deductions. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); Treas. Reg. § 1.6001-1(a). Petitioners do not contend, and the evidence does not establish, that the burden of proof shifts to respondent under section 7491(a) as to any issue of fact.

II.   *Bad Debt Deduction*

A.   *Governing Legal Principles*

Section 166(a)(1) allows as an ordinary loss deduction any bona fide debt that becomes worthless within the taxable year, except in the case of certain nonbusiness debts defined in section 166(d). A bona fide debt is a debt that arises from "a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." *Zimmerman v. United States*, 318 F.2d 611, 612 (9th Cir. 1963) (quoting Treas. Reg. § 1.166-1(c)); *Kean v. Commissioner*, 91 T.C. 575, 594 (1988); Treas. Reg. § 1.166-1(c). A contribution to capital is not considered a "debt" for purposes of section 166. *Kean*, 91 T.C. at 594.

Whether an advance of funds is treated as genuine debt "must be considered in the context of the overall transaction." *Hardman v. United States*, 827 F.2d 1409, 1411 (9th Cir. 1987). Our inquiry typically focuses on whether the taxpayer intended to create a debt with a reasonable expectation of repayment and (if so) whether that intent comports in substance with the creation of a debtor-creditor relationship. *Litton*

**[\*11]** *Bus. Sys., Inc. v. Commissioner*, 61 T.C. 367, 377 (1973); *Ill. Tool Works Inc. & Subs. v. Commissioner*, T.C. Memo. 2018-121, 116 T.C.M. (CCH) 124, 130–31. "The outward form of the transaction is not controlling; rather, characterization depends on the taxpayer's actual intent, as evidenced by the circumstances and conditions of the advance." *Bauer v. Commissioner*, 748 F.2d 1365, 1367–68 (9th Cir. 1984), *rev'g* T.C. Memo. 1983-120.

Absent stipulation to the contrary, appeal of this case would lie to the U.S. Court of Appeals for the Ninth Circuit. *See* § 7482(b)(1)(A). That court has identified 11 factors that may be relevant in determining whether a transfer to a corporation by a shareholder is a debt or a contribution to capital. No one factor is controlling or decisive, and the Ninth Circuit directs us to look to the particular circumstances of each case. *Hardman*, 827 F.2d at 1412. "The object of the inquiry is not to count factors, but to evaluate them." *Id.* (quoting *Bauer v. Commissioner*, 748 F.2d at 1368)). "The burden of establishing that the advances were loans rather than capital contributions rests with the taxpayer." *Bauer v. Commissioner*, 748 F.2d at 1368 (citing *O.H. Kruse Grain & Milling v. Commissioner*, 279 F.2d 123, 125 (9th Cir. 1960), *aff'g* T.C. Memo. 1959-110).

The Ninth Circuit in *Hardman* identified the following factors as potentially relevant to the debt-vs.-equity inquiry: (1) the names given to the certificates evidencing purported debt; (2) the presence or absence of a maturity date; (3) the source of the payments, and in particular whether they are dependent upon earnings; (4) the right to enforce payment of principal and interest; (5) whether the advances increase participation in management; (6) whether the "lender" has a status equal or inferior to that of regular creditors; (7) objective indicators of the parties' intent; (8) whether the capital structure of the "borrower" is thin or adequate; (9) the extent to which the funds advanced are proportional to the shareholder's capital interest; (10) the extent to which interest payments come from "dividend" money; and (11) the ability of the "borrower" to obtain loans from outside lending institutions. *See Hardman*, 827 F.2d at 1411–12.

B.    *Analysis*

Our examination of the bad debt issue is greatly simplified in this case by the January 1, 2012, Unanimous Consent resolution executed by the shareholders of IWS. By that resolution all shareholder loans in existence on that date were canceled and converted to paid-in capital,

[*12] i.e., equity. Petitioners do not contend that they or the Riemenschneiders advanced any funds to IWS, directly or through KRLLC, after January 1, 2012. As of 2017, therefore, there existed no debt from IWS that could have gone bad.

By way of reply petitioners note that KRLLC was not itself a shareholder in IWS. They accordingly argue that the Unanimous Consent resolution, while canceling all *shareholder* loans as of January 2012, left the alleged loan from KRLLC intact. The business records of IWS unambiguously refute this argument.

The trial evidence includes IWS's financial statements from 2008 onwards. Each yearend balance sheet includes, among IWS's long-term liabilities, "Notes Payable – Stockholders." Each balance sheet includes in this category all loans made in substance by stockholders, whether directly or through an entity wholly owned by stockholders. For each year, therefore, the "N/P – Keeton Riemenschneider" is classified as a "Note[] Payable – Stockholder[]." The balance sheets accord the same treatment to the loan extended by Ron Riemenschneider, a 6% shareholder, who made advances through Ideal Tractor, Inc., an entity he controlled. For each year, the "N/P Ideal Tractor, Inc." is classified as a "Note[] Payable – Stockholder[]."

For 2008–2011 the IWS balance sheets classify the following amounts allegedly owed to KRLLC as "Notes Payable – Stockholders":

| Year | Balance Due |
|------|-------------|
| 2008 | $3,217,540 |
| 2009 | 3,052,440 |
| 2010 | 1,298,440 |
| 2011 | 1,298,440 |

Each balance sheet separately shows, among "Notes Payable – Stockholders," a loan from Robert Riemenschneider captioned "N/P – RL Riemenschneider." The balance of that loan, as of yearend 2011, was shown as $316,217. According to IWS's balance sheet, therefore, the total amount shown as due to petitioners and the Riemenschneiders, through KRLLC or directly, was $1,614,657 at yearend 2011 ($1,298,440 + $316,217 = $1,614,657).

**[\*13]** In the Unanimous Consent resolution the shareholders resolved that "the liability for the notes payable [to IWS] shall be eliminated by converting the notes payable to paid in capital for each of the respective shareholders." The resolution states that, as of January 1, 2012, the loans thus canceled included the following:

| Shareholders | Note Payable |
|---|---|
| Robert and Lorene Riemenschneider | $995,546 |
| Arland and Jean Keeton | 679,329 |
| Total | $1,674,875 |

The loans thus canceled clearly included the loans that petitioners and the Riemenschneiders extended through KRLLC. Petitioners admitted at trial that they advanced no funds to IWS directly; rather, all their advances were made through KRLLC. The debt to petitioners shown as canceled in the Unanimous Consent document, $679,329, is roughly half the amount shown as "N/P – Keeton Riemenschneider" in the company's 2011 balance sheet, $1,298,440 (the record does not explain the $60,218 difference). The debt to petitioners shown as canceled thus corresponds to their 50% ownership interest in KRLLC. And the aggregate debt to petitioners and the Riemenschneiders shown as canceled in the Unanimous Consent document, $1,674,875, roughly equals the sum of the notes payable to KRLLC and Robert Riemenschneider reported on the 2011 balance sheet, $1,614,657 (again the record does not explain the $60,218 difference).

Consistently with this analysis, IWS's balance sheet for yearend 2012 shows no notes payable to shareholders and no note payable to KRLLC. Rather, it shows $2,606,001—the total amount of "Notes Payable to Stockholders" that appeared on the 2011 balance sheet—as having been converted to "paid in capital." Petitioners do not contend that they or the Riemenschneiders advanced any funds to IWS, directly or through KRLLC, after January 1, 2012. As of 2017, therefore, there existed no debt from IWS for which a bad debt deduction could be claimed.

This conclusion by itself supplies a sufficient basis on which to sustain respondent's disallowance of the $2,095,757 bad debt deduction that KRLLC claimed for 2017. For purposes of completeness, however, we will also consider whether a bona fide debt existed between IWS and KRLLC as of December 31, 2011, immediately before the debt-to-equity conversion. In so doing we consider the factors identified by the Ninth

[*14] Circuit in *Hardman*. The factors with greatest salience here clearly point to characterization of KRLLC's advances as capital contributions rather than debt.[4]

### 1. *Terminology Used by the Parties*

Genuine indebtedness is typically indicated by the issuance of a bond, debenture, or promissory note. *See Hardman*, 827 F.2d at 1412; *Am. Offshore, Inc. v. Commissioner*, 97 T.C. 579, 602 (1991). However, where a corporate "debtor" is closely held and is related to its putative creditor, the form of the transaction and the labels the parties used may have less significance. That is because related parties are free to mold the transaction using whatever labels they wish. *See Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968); *Anchor Nat'l Life Ins. Co. v. Commissioner*, 93 T.C. 382, 406–07 (1989).

KRLLC advanced funds to IWS from the mid-1990s through August 2007. During the decade in which these advances were made, there were no promissory notes, debentures, or other "certificates evidencing the indebtedness." *Hardman*, 827 F.2d at 1412. Rather, the advances were made on open account, tracked in a QuickBooks register maintained by petitioner wife. This register was a product of KRLLC's internal bookkeeping. It was not promissory note or other binding instrument that KRLLC could take to court to establish an enforceable promise to pay.

The terminology used in recording these advances, moreover, is hostile to the notion that they created a genuine debt. The first entry in the QuickBooks register, made on December 31, 1999, shows a credit of $3,331,093 in KRLLC's favor. This entry was apparently designed to capture advances KRLLC had made to IWS since the latter's inception in 1994, and it is captioned "Investment – Idaho Waste." An entry for December 31, 2000, showing a credit of $264,372, is likewise captioned "Investment – Idaho Waste." These entries suggest capital contributions.

---

[4] Besides disputing the existence of a bona fide debt, respondent contends that petitioners have failed to prove (1) that any debt owed by KRLLC became worthless during 2017, the year for which the deduction was claimed; (2) that $2,095,757 was the correct dollar amount of any debt that became worthless; or (3) that any debt held by KRLLC was a business debt, as opposed to a nonbusiness debt qualifying for only limited deductibility under section 166(d). Given our disposition we need not consider these additional arguments.

**[\*15]** Other credit entries for 1999–2001—captioned "capital," "capital gains," "equipment," and "equipment lease income"—are difficult to reconcile with debt characterization.[5] A pair of entries for 1999 and 2001, totaling $1,893,437, are captioned "loan from Wells Fargo." These entries do not evidence loans from KRLLC to IWS. Rather, they denote bank loans extended to KRLLC or its partners, the proceeds of which the partners contributed to IWS.

The only "certificate[] evidencing the indebtedness," *Hardman*, 827 F.2d at 1412, is the October 31, 2008, document captioned "Idaho Waste Systems, Inc." In this document IWS promises to pay KRLLC "on demand" the sum of $3,222,076.89. Robert Riemenschneider signed this document in his capacity as president of IWS; there are no other signatories.

For several reasons we accord this document little weight. IWS received no funds from KRLLC in consideration of executing this document. Quite the contrary: KRLLC had ceased advancing funds to IWS in August 2007, 14 months previously. The purported promissory note thus represents an apparent effort to convert into debt, retroactively, the open-account advances that KRLLC had made to IWS on dozens of occasions during the prior decade. As explained above, there is little or no evidence that these advances constituted debt.

There are other problems with the October 31, 2008, document. The amount shown as due, $3,222,076.89, bears no discernible relationship to the "Due from IWS" QuickBooks register in which KRLLC recorded its advances. That register has no entries whatever for calendar year 2008, and the last entry for 2007 shows an alleged balance due from IWS of $7,424,926. At trial petitioner husband did not recognize the purported promissory note. He stated that he had no "knowledge or involvement about that note at the time" and "wasn't involved in it[s] being written or anything else."

Finally, the October 31, 2008, document clearly reflected a related-party transaction. Robert Riemenschneider, who signed the note for the putative obligor, owned with his wife 50% of KRLLC, the putative obligee. The labels he assigned are thus far from dispositive. *See Fin Hay Realty Co.*, 398 F.2d at 697; *Anchor Nat'l Life Ins. Co.*, 93 T.C. at 406–07. For all these reasons, we give little weight to the purported

---

[5] Some of these entries are rather cryptic. All were yearend entries made by Mr. Holland, KRLLC's outside accountant at the time. He did not testify at trial.

**[\*16]** promissory note and find that the first *Hardman* factor strongly favors respondent.

### 2. *Presence or Absence of Maturity Date*

"[A] definite maturity date on which the principal falls due for payment, without reservation or condition, . . . is a fundamental characteristic of a debt." *Monon R.R. v. Commissioner*, 55 T.C. 345, 359 (1970). On the other hand, "[t]he absence of a fixed maturity date indicates that repayment is tied to the fortunes of the business" and thus tends to support equity characterization. *Hardman*, 827 F.2d at 1413; *Am. Offshore, Inc.*, 97 T.C. at 602.

KRLLC's advances to IWS between 1994 and 2007 were reflected in no promissory note or other debt instrument and thus necessarily lacked a fixed maturity date. The purported 2008 promissory note likewise has no fixed maturity date. It states only that IWS will repay the principal "on demand" and that interest will accrue at 9% "until paid." The document imposes no repayment schedule, stating only that "[a]ny part [of the principal] may be paid at any time." The implication of this demand note is that KRLLC would be repaid only if and when IWS was sufficiently profitable to make repayment.

Petitioners seek to explain the absence of a maturity date by characterizing KRLLC's advances as a "working line of credit." We do not find this characterization apt. A line of credit necessarily has a limit; when the limit is reached, no further borrowing is possible. There was no set limit (and no apparent limit) to KRLLC's cash advances, which continued inexorably for a decade, topping out with an alleged balance due of $7,424,926 at yearend 2007. In any event, a line of credit must be repaid at some point, and neither the pre-2008 advances nor the purported 2008 promissory note contains the remotest suggestion of a repayment date. We find that this second *Hardman* factor likewise favors equity treatment.

### 3. *Source of Payments*

A true lender is concerned with a reliable return on his investment in the form of interest and repayment of principal. *Curry v. United States*, 396 F.2d 630, 634 (5th Cir. 1968); *Dev. Corp. of Am. v. Commissioner*, T.C. Memo. 1988-127, 55 T.C.M. (CCH) 455, 483. If timely payments to the alleged lender are not made, or if they can plausibly be made only out of future earnings, an inference arises that the advances

[*17] were contributions to capital. *Hardman*, 827 F.2d at 1413; *Am. Offshore, Inc.*, 97 T.C. at 602.

IWS did not make consistent payments of interest to KRLLC at any time. The QuickBooks register shows only three interest payments between 1999 and 2007: two payments totaling $18,411 at yearend 2005 and a payment of $8,390 at yearend 2007. On those dates the register showed the alleged balances due from IWS as $6,109,521 and $7,424,926, respectively. If the interest reported as paid was recorded on the alleged balance due, it would have been paid at a rate of 0.3% and 0.1%, respectively. That is a far cry from the 9% rate specified in the 2008 purported promissory note. And there is no evidence, in the Quick-Books register or elsewhere, that IWS after October 31, 2008, ever made a single interest payment on that purported note, at a rate of 9% or otherwise.

Petitioner husband testified at trial that all cash advances made by KRLLC to IWS included unstated interest at a rate of 9%. But virtually all these advances were in round numbers ($10,000, $45,000, $190,000, $460,000, etc.). Mathematically speaking, it is hard to imagine how such amounts could have included an interest charge. In any event, interest on the advances could not have been calculated ab initio because the term of the "loan" was unknowable.

Petitioners did not introduce into the record any IWS financial statements for years before 2008. But for 2008 IWS reported retained earnings of negative $5,460,671, indicating that it had suffered substantial losses in prior years. Petitioner husband admitted at trial that, during the 2007–2010 timeframe, IWS was not "in any kind of position to pay back [KRLLC] anything." Given this track record, no reasonable third-party lender could have viewed IWS as financially sound enough to make regular interest payments at a 9% rate. We thus view the third *Hardman* factor as strongly favoring equity treatment.

### 4. *Right to Enforce Payment*

The existence of a right to enforce payment of principal and interest is a further indicator of bona fide debt. *Hardman*, 827 F.2d at 1413; *Gokey Props., Inc. v Commissioner*, 34 T.C. 829, 835 (1960), *aff'd*, 290 F.2d 870 (2d Cir. 1961). KRLLC lacked any meaningful enforcement rights. The purported promissory note had no repayment schedule and no fixed maturity date. IWS's true creditors, including Premier West and Mr. Yarbrough, demanded a security interest in the landfill

[*18] property, IWS's most valuable asset. KRLLC demanded from IWS no security interest of any kind. And unlike the financial institutions from which IWS sought financing in 2015 and 2016, which required guaranties from all 20% shareholders, KRLLC foreswore that enforcement mechanism as well. This factor strongly favors respondent.

### 5. *Participation in Management*

If a taxpayer's advances to a corporation entitle him to greater participation in its management, the advances are more likely to be treated as equity. *Hardman*, 827 F.2d at 1413; *Am. Offshore, Inc.*, 97 T.C. at 603. Petitioners and the Riemenschneiders, who jointly owned 100% of KRLLC, jointly owned 69% of IWS. But KRLLC's advances did not explicitly entitle them to any greater role in IWS's management. We regard this factor as neutral.

### 6. *Status Compared to Regular Creditors*

If a shareholder's rights to repayment of principal and interest are subordinated to the rights of regular creditors, then such advances are likelier to merit equity treatment. *Hardman*, 827 F.2d at 1413. Even absent an explicit subordination clause, the failure to demand timely repayment or to take collateral effectively subordinates the alleged debt to the rights of other creditors, who may receive payment or foreclose on their security in the interim. *Am. Offshore, Inc.*, 97 T.C. at 603.

According to its QuickBooks register, KRLLC advanced more than $7 million to IWS, on an unsecured basis, between 1999 and 2007. All of those advances were subordinated to the claims of IWS's later creditors. In 2007 IWS put up its landfill property as collateral for a $5 million loan from Premier West. When IWS could not repay that loan, the landfill property became security for a $4.2 million loan from Mr. Yarbrough, who ultimately foreclosed on the collateral when IWS defaulted. At no point did KRLLC secure collateral from IWS, make demand for the payment of interest or principal, or otherwise take steps to collect its alleged debt. Such behavior is wholly inconsistent with a typical debtor-creditor relationship, and this factor thus favors respondent.

### 7. *Objective Indicators of the Parties' Intent*

The parties' words and actions may supply evidence as to whether they intended cash advances to be debt or equity. *Hardman*, 827 F.2d at 1413. Because petitioners did not submit into evidence IWS's

**[\*19]** pre-2008 financial statements, the principal evidence of their intent regarding advances through August 2007 appears in the "Due from IWS" QuickBooks register. As noted *supra* pp. 14–15, several million dollars' worth of entries on that register are described as items such as "Investment – Idaho Waste," "capital," "capital gains," "equipment," and "equipment lease income." None of these descriptions favors debt treatment.

### 8. *"Thin" or Adequate Capitalization*

The purpose of examining the alleged borrower's debt-to-equity ratio is to determine whether it is so thinly capitalized that it would be unable to repay the debt if its financial condition worsened. *Bauer v. Commissioner*, 748 F.2d at 1369. A true creditor desires robust capitalization to guard against this risk. Thin capitalization thus suggests that shareholder advances to a corporation are capital contributions. *Hardman*, 827 F.2d at 1414; *Hubert Enters., Inc. v. Commissioner*, 125 T.C. 72, 96–97 (2005), *aff'd in part, vacated in part, and remanded on other grounds*, 230 F. App'x 526 (6th Cir. 2007).

IWS was severely undercapitalized at all times. In the absence of financial statements for years before 2008, it is impossible to calculate debt-to-equity ratios for that period. But at yearend 2008, after executing the purported promissory note to KRLLC, IWS reported liabilities of $12,615,390 and shareholder equity of negative $4,433,981. This computes to a debt-to-equity ratio nearing infinity. *See, e.g.*, *Dunmire v. Commissioner*, T.C. Memo. 1981-372, 79 T.C.M. (CCH) 1769, 1774 n.24 (noting that, where shareholder equity is a negative number, the debt-to-equity ratio approaches infinity). This factor strongly favors respondent.

### 9. *Identity of Interest*

Where a stockholder owns "debt" in the same proportion to which he holds stock in the corporation, the characterization of his advances as "debt" may be suspect. *Bauer v. Commissioner*, 748 F.2d at 1370. Petitioners and the Riemenschneiders owned 100% of KRLLC, the alleged obligee. Petitioners and the Riemenschneiders owned 69% of IWS, the alleged obligor, and the Riemenschneiders' children owned another 11% of IWS. Petitioners and the Riemenschneiders thus had complete control over both entities at all times. *Cf.* § 318(a)(1) (providing that an individual is deemed to own the shares of any spouse and children for purposes of determining corporate control). While the record does not

[*20] reveal an identity of interest, it reveals a strong overlapping of interest, and this factor thus offers little help to petitioners.

### 10.   *Relatedness of Payments to Profits*

A true lender is concerned with reliable payment of interest. A lack of interest payments—and the alleged debtor's lack of current ability to make them—suggests that the party advancing funds is looking to the corporation's future earnings to achieve a return on his investment. *Hardman*, 827 F.2d at 1414; *Am. Offshore, Inc.*, 97 T.C. at 605. This factor, like the third *Hardman* factor, thus favors respondent. *See supra* pp. 16–17.

### 11.   *Ability to Borrow from Other Sources*

If the corporation is able to borrow funds from third-party lenders on substantially the same terms as those imposed by the payor of the advance, an inference arises that the advance may be debt. *Hardman*, 827 F.2d at 1414; *Segel v. Commissioner*, 89 T.C. 816, 828 (1987); *Ill. Tool Works Inc.*, 116 T.C.M. (CCH) at 135. IWS allegedly borrowed more than $7 million from KRLLC, for a period of more than a decade, at an effective interest rate of zero, offering no collateral and no guaranties from its shareholders.

It is obvious that IWS could not have secured such terms from an unrelated third party. Although IWS sought credit from many financial institutions during this period, most turned it down. The two third-party lenders that did extend credit, Premier West and Mr. Yarbrough, demanded a security interest in the landfill property, which represented more than 70% of IWS's assets. And when IWS approached outside financial institutions (unsuccessfully) during 2015 and 2016, they demanded guaranties from all shareholders owning 20% or more of the company. The final *Hardman* factor thus favors respondent.

In sum, we conclude that KRLLC's advances to IWS from inception through August 2007 did not give rise to bona fide debt, but rather constituted capital contributions on behalf of petitioners and the Riemenschneiders. Assuming arguendo that some portion of these advances constituted debt, that debt was extinguished by the Unanimous Consent resolution in January 2012, when all loans from shareholders were converted to paid-in capital. For both of these reasons, there remained no debt from IWS to KRLLC that could have become worthless in 2017, the year for which the bad debt deduction was claimed. We thus sustain the IRS's disallowance of that deduction and of the pass-

**[\*21]** through loss deduction and carryover NOL deduction claimed on petitioners' 2017 and 2018 returns, respectively.

III.  *Accuracy-Related Penalties*

Section 6662 imposes a 20% accuracy-related penalty on any underpayment of tax required to be reported on a return attributable to, among other things, any "substantial understatement of income tax." § 6662(a), (b)(2).  An understatement is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. § 6662(d)(1)(A).

Respondent bears the burden of production with respect to this penalty.  *See* § 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001).  Petitioners' returns for 2017 and 2018 reported zero tax due. Respondent's notice of deficiency, whose determinations we have sustained, determined deficiencies of $119,471 and $104,479, respectively. Petitioners' understatements of income tax thus exceeded $5,000 and 10% of the tax required to be shown on their returns.  Respondent has thus met his burden of production to show a "substantial understatement of income tax."

Respondent's burden of production also requires that he show compliance with section 6751(b)(1).  *See* § 7491(c); *Graev v. Commissioner*, 149 T.C. 485, 492–93 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016).  That section provides that no penalty "shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination."  The parties have stipulated that the examining agent, RA Balding, secured timely approval from his immediate supervisor, Joshua Cook, for assertion of accuracy-related penalties under section 6662(a).  Respondent has thus met his burden of production in all respects.

Section 6664(c)(1) provides that the accuracy-related penalty will not be imposed with respect to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith."  The decision whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all facts and circumstances.  *See* Treas. Reg. § 1.6664-4(b)(1).  Generally, the most important factor is the taxpayer's effort to assess his proper tax liability.  Other circumstances include the experience, knowledge, and education of the taxpayer, as well as the

[*22] extent to which he reasonably and in good faith relied on the advice of a competent professional tax adviser. *Id.* paras. (b)(1), (c)(1); *see Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98–99, *aff'd*, 299 F.3d 221 (3d Cir. 2002).

Petitioners contend that they relied in good faith on advice from their return preparer, Jennifer Werner. As a preliminary matter, we do not know what advice petitioners actually received from Ms. Werner. She did not communicate with petitioners directly; rather, she communicated with petitioners' daughter, Ms. Gilmore, in connection with preparation of the 2017 and 2018 tax returns. Petitioners did not make Ms. Gilmore available to testify about the advice she received from Ms. Werner or about the advice (if any) that she relayed to petitioners. Nor did petitioners testify about the second-hand advice (if any) that they got from Ms. Gilmore. Petitioners have thus failed to establish that they actually received and relied on professional advice.

In order for reliance on professional advice to be reasonable, the professional must have "arrive[d] at that advice independently." *Neonatology Assocs., P.A.*, 115 T.C. at 98. Ms. Werner testified that she essentially transposed the $2,095,757 "bad debt" number from KRLLC's QuickBooks register to line 11 of KRLLC's 2017 tax return, without investigating the propriety of either the amount or the nature of the loss it purported to represent. Because the claimed bad debt was the product of petitioners' own bookkeeping, any advice Ms. Werner may have rendered was not "independent."

To establish reasonable cause, a taxpayer must also have provided the adviser with all necessary and accurate information. *Id.* at 99. Petitioners did not inform Ms. Werner, at the time she prepared the 2017 tax returns, that they had executed in 2012 a Unanimous Consent resolution that converted all shareholder loans to equity. At trial Ms. Werner admitted that knowledge of this resolution would have been relevant to her analysis of whether KRLLC could properly claim a bad debt loss deduction for 2017.

For these reasons, we are unable to conclude that petitioners had reasonable cause for their substantial understatements of income tax. We accordingly sustain respondent's determination of accuracy-related penalties for both years.

To reflect the foregoing,

*Decision will be entered for respondent.*