# United States Tax Court

T.C. Memo. 2024-8

ESTATE OF THOMAS H. FRY, DECEASED, RUTH M. FRY, PERSONAL REPRESENTATIVE, AND RUTH M. FRY, Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent

———————

Docket No. 13242-20.　　　　　　　　　　Filed January 23, 2024.

———————

*William M. Weintraub* and *Sean A. McCormick*, for petitioners.

*Justine S. Coleman*, *Vincent S. Uy*, and *Aely K. Ullrich*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WEILER, *Judge*: This case arises from a notice of deficiency dated September 28, 2020, in which the Internal Revenue Service (IRS or respondent) determined a deficiency in Thomas H. Fry and Ruth M. Fry's 2013 joint federal income tax of $1,318,597, an addition to tax under section 6651(a)(1)[1] of $65,930, and an accuracy-related penalty under section 6662(a) of $263,719. The issues for decision are whether (1) the Transfers and the Payments from Crown Disposal, Inc. (Crown), to CR Maintenance Services, Inc. (CR Maintenance), are bona fide debt or equity, (2) Mr. Fry had an adequate basis to claim the disallowed flowthrough loss from CR Maintenance of $3,455,006, (3) respondent is harmed by a finding that the Transfers and the Payments are equity,

———————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[*2] (4) the Frys are liable for the late filing addition to tax pursuant to section 6651(a)(1), and (5) the Frys are liable for the accuracy-related penalty pursuant to section 6662(a) and (b)(2) for a substantial understatement of income tax.

Respondent filed his Answer on December 31, 2020. On November 26, 2021, respondent filed a Motion for Leave to File First Amendment to Answer. In his First Amendment to Answer respondent sought to assert, for the first time, two affirmative defenses: the duty of consistency and the doctrine of election. We granted respondent's Motion, and the First Amendment to Answer was filed December 16, 2021.

FINDINGS OF FACT

The parties filed a First Stipulation of Facts with accompanying Exhibits, which was admitted at trial. Respondent filed a Proposed Trial Exhibit, which was likewise admitted at trial. Some facts have been stipulated and are so found. The Frys resided in California when the Petition was timely filed.

Mrs. Fry filed a joint Form 1040, U.S. Individual Income Tax Return, with her husband, Mr. Fry, for tax year 2013. Since filing the Petition, Mr. Fry has passed away. Mrs. Fry is authorized to represent the estate of Thomas H. Fry in this case.

I.     *Background*

Mr. Fry was the sole shareholder of two S corporations, Crown and CR Maintenance, which conducted business operations in a highly integrated manner despite being organized as separate businesses. In 2013 CR Maintenance was based in Sun Valley, California. Crown was based in the same facility as CR Maintenance. From 2008 through 2015 Mr. Fry received an officer salary and rent payments from both CR Maintenance and Crown.

Crown's business operations included the collection of trash, recyclables, and other waste from individuals, apartment buildings, and commercial establishments for a fee. CR Maintenance's business operations consisted of processing the trash, recyclables, and other waste collected by Crown into commodities such as alfalfa, olive oil, and wheat for sale to third parties. Crown did not pay CR Maintenance for taking possession of the waste collected, nor did Crown share collection fees with CR Maintenance.

**[*3]**    Crown and CR Maintenance conducted an integrated business operation, shared the same principal place of business, and used the same maintenance, payroll, corporate officers, and accountant. Mr. Fry was the president and treasurer of both Crown and CR Maintenance. John Richardson was the vice president and corporate secretary for both Crown and CR Maintenance. Gary Margolis was the accountant for Mr. and Mrs. Fry, CR Maintenance, and Crown. Mr. Margolis had been a certified public accountant (CPA) for 31 years and had been Mr. Fry's accountant for approximately 20 of those years. As Mr. Fry's accountant, Mr. Margolis prepared the tax returns for the Frys, CR Maintenance, and Crown.

II.    *Profitability of CR Maintenance*

By 2010 CR Maintenance was not profitable and required substantial financial support to meet its obligations. During 2011 a contract between the City of Los Angeles and CR Maintenance was withdrawn by the City after an accident resulted in the death of two CR Maintenance employees. Following the withdrawal of the contract with the City, CR Maintenance was never again profitable and began losing between $5 and $7 million per year.

Beginning in 2010 and through 2013 Crown provided financial support to CR Maintenance to allow it to continue operating. During this period Mr. Richardson and Mr. Fry would meet each month to review the financial positions of Crown and CR Maintenance to determine whether CR Maintenance required additional funds from Crown to meet its obligations. If CR Maintenance was unable to meet its obligations for that month, Mr. Fry would instruct Crown to transfer funds via check or bank-to-bank transfers directly to CR Maintenance (Transfers). Crown did not distribute cash to Mr. Fry, nor did Mr. Fry contribute cash to CR Maintenance. CR Maintenance used the Transfers to pay general business operating costs. During this period Crown, on behalf of CR Maintenance, also made payments directly to CR Maintenance's vendors for certain expenses such as fuel, wages, payroll taxes, workers' compensation insurance, and employee benefits (Payments). At trial Mr. Richardson testified that Mr. Fry treated his companies like his "baby" and wanted to ensure that both CR Maintenance and Crown continued operating.

**[\*4]**    At the end of 2013 the net total of the Transfers and the Payments was $36,255,141,[2] which accounts for the money that CR Maintenance transferred back to Crown by the end of 2013. CR Maintenance had not made any transfers back to Crown of any portion of the Transfers; however, CR Maintenance had transferred a portion of the Payments back to Crown by the end of 2013. By the end of 2020 CR Maintenance had transferred back to Crown the total amount of the Transfers and the Payments it had received between 2006 and 2020.

III.    *Characterization of the Transfers and the Payments*

Despite the Transfers and the Payments by Crown of some $36 million, CR Maintenance did not provide any promissory notes regarding the Transfers and the Payments and did not have any written due dates for a return of the money. No security interest was requested by Crown or granted by CR Maintenance. Furthermore, CR Maintenance did not make, nor promise to make, interest payments related to the Transfers and the Payments.

CR Maintenance accounted for each of the Transfers from Crown as a "Loan Payable" in its general ledger liability from 2010 through 2014. From 2006 through 2013 CR Maintenance accounted for the Payments made by Crown as "Due to Crown" in another general ledger liability account. From 2010 through 2017 CR Maintenance documented the Transfers and the Payments as liabilities between CR Maintenance and Crown. From 2006 through 2013 Crown accounted for the expenses it paid on CR Maintenance's behalf as "Due from CR [Maintenance]." Crown documented the Transfers and the Payments as liabilities between Crown and CR Maintenance from 2010 through 2017. CR Maintenance intended to repay Crown for the Transfers and the Payments if it was profitable.

From 2010 through 2020 CR Maintenance reported the Transfers and the Payments as a balance due to Crown on its tax returns and characterized them as debts. On its returns filed between 2009 and 2019 CR Maintenance did not report the Transfers and the Payments as additional capital contributions from Mr. Fry. Crown reported the Transfers and the Payments as a liability due from CR Maintenance on

---

[2] The net amount of the Transfers and the Payments was $12,047,558 and $24,207,583, respectively.

[*5] its tax returns for 2010 through 2020 and characterized these transactions as indebtedness.

The Frys did not report distributions from Crown to Mr. Fry on their tax returns filed between 2008 and 2019. However, between 2008 and 2020, Crown did report distributions and repayment of shareholder loans on Mr. Fry's Schedules K–1, Shareholder's Share of Income, Deductions, Credits, etc., as follows:

| Year ended | Line 16(d) property distributions other than dividends | Line 16(e) repayment of SH Loans |
|---|---|---|
| 2008 | — | — |
| 2009 | $1,993,500 | — |
| 2010 | 3,413,262 | — |
| 2011 | 443,361 | — |
| 2012 | — | — |
| 2013 | — | $1,062,587 |
| 2014 | 4,634,000 | 584,500 |
| 2015 | — | — |
| 2016 | 39,022,011 | — |
| 2017 | 11,382,695 | — |
| 2018 | 3,196,524 | — |
| 2019 | 8,511,004 | — |
| 2020 | 16,862,695 | — |

On November 10, 2014, the Frys untimely filed their joint Form 1040 for the 2013 tax year, which was due on October 15, 2014. For tax year 2013 CR Maintenance filed Form 1120S, U.S. Income Tax Return for an S Corporation, and reported an ordinary loss of $5,650,651. The Frys claimed a flowthrough loss deduction of $4,733,675 from CR Maintenance on their individual return for the 2013 tax year.

In 2015 Crown and CR Maintenance received cash from their sale of most of their assets for about $70 million. Crown distributed all of its cash from the sale of its assets to Mr. Fry in 2015, 2016, and 2017. After Crown distributed the remaining cash to Mr. Fry from the sale of its assets to Recology, Mr. Fry received no further distributions from Crown.

**[\*6]**     Following the distributions of the cash to Mr. Fry, Crown had insufficient assets for tax years 2017 through 2020 to make any further distributions to Mr. Fry. The "distributions" on Crown's tax returns were not actual distributions but accounting entries intended to balance Crown's balance sheet. On Form 1120S the reductions appear as distributions, but no such distributions actually occurred. The reductions of amounts described as "Due from" CR Maintenance by Crown were writeoffs of the Transfers and the Payments as "bad debts" for 2017 through 2020. At trial it was established that Mr. Margolis performed the adjustment to "offset between [CR Maintenance] and Crown exactly everything that [CR Maintenance] owed Crown" for 2017 through 2020. These entries were accounting "plugs" or noncash distributions. Without the use of accounting plugs, the bases for tax years 2017, 2018, and 2019 would have been greater than the losses claimed for those years.

IV.     *Mr. Fry's Bases in Crown and CR Maintenance*

For tax years 2006 through 2013 Mr. Fry reported stock bases in CR Maintenance as shown in the tables below:

|  | *2006* | *2007* | *2008* | *2009* |
|---|---|---|---|---|
| Stock basis before distribution | $12,846,846 | $5,594,331 | $3,620,530 | $3,130,741 |
| Less: distribution | 7,806,000 | 2,150,000 | 1,148,000 | 2,752,000 |
| Stock basis available for loss | 5,040,846 | 3,444,331 | 2,472,530 | 378,741 |
| Ordinary loss per 1120S return (or as adjusted/amended) | — | — | — | — |
| Nondeductible expenses | (239,535) | — | (50,154) | — |
| Section 179 expense deduction | (108,000) | — | — | — |
| Ending stock basis | 4,693,311 | 3,444,331 | 2,422,376 | 378,741 |
| Excess loss over stock basis | — | — | — | — |

| [*7] | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| Stock basis before distribution | $2,507,005 | $860,865 | $14,597 | $2,438 |
| Less: distribution | — | — | — | — |
| Stock basis available for loss | 2,507,005 | 860,865 | 14,597 | 2,438 |
| Ordinary loss per 1120S return (or as adjusted/amended) | (1,455,671) | (2,186,500) | (7,063,393) | (5,650,561) |
| Nondeductible expenses | (231,216) | — | — | — |
| Section 179 expense deduction | — | — | — | — |
| Ending stock basis | 820,118 | — | — | — |
| Excess loss over stock basis | — | (1,325,635) | (7,048,796) | (5,648,123) |

For tax years 2006 through 2020 Mr. Fry reported an ending basis in Crown as shown in the tables below:

| | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| Stock basis | $5,271,709 | $6,487,237 | $12,506,344 | $17,615,743 | $21,371,956 |
| Debt basis | — | — | — | — | 876 |

| | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| Stock basis | $26,115,562 | $33,813,557 | $42,724,064 | $42,845,299 | $80,805,783 |
| Debt basis | 577,000 | 1,647,087 | 584,500 | — | — |

| | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Stock basis | $41,294,782 | $35,676,709 | $32,092,492 | $23,285,424 | $6,418,079 |
| Debt basis | — | — | — | — | — |

**[\*8]** V.      *Notice of Deficiency and Period of Limitations*

On September 28, 2020, respondent issued the Frys a notice of deficiency for tax year 2013 determining a deficiency in income tax, an addition to tax pursuant to section 6651(a)(1), and an accuracy-related penalty pursuant to section 6662(a). Following the examination the IRS determined the flowthrough loss from CR Maintenance was $1,276,231 and disallowed $3,457,444 in flowthrough loss because of Mr. Fry's lack of basis. Respondent has conceded that the Frys are entitled to an additional $2,438 in flowthrough loss. Respondent's initial determination to assert an accuracy-related penalty was personally approved in writing by the examiner's immediate supervisor.

The periods of limitations for examining the Frys' individual income tax returns for tax years 2008 through 2012 and 2014 through 2019 have expired.[3] The periods of limitations for examining CR Maintenance's Forms 1120S, Schedules K–1, and amended Forms 1120S[4] for tax years 2008 through 2019 have expired. The periods of limitations for examining Crown's Forms 1120S and amended Forms 1120S[5] for tax years 2008 through 2019 have expired.

OPINION

I.      *Summary of the Parties' Arguments*

A.      *Petitioners' Argument*

Petitioners argue that under relevant caselaw, the Transfers and the Payments from Crown to CR Maintenance were not bona fide debt; rather, they were constructive equity contributions and distributions. Petitioners further argue that if the Transfers and the Payments are considered equity contributions, Mr. Fry had a sufficient stock basis to deduct $3,455,006 in flowthrough losses from CR Maintenance on their 2013 tax return. Moreover, petitioners assert that if the Frys are found liable for a penalty pursuant to section 6662(a), the Frys are entitled to a reasonable cause defense since they relied in good faith on the advice of their accountant.

---

[3] The Frys filed Form 1040X, Amended U.S. Individual Income Tax Return, to amend their 2010 tax return.

[4] CR Maintenance filed an amended tax return for tax year 2010.

[5] Crown filed amended tax returns for tax years 2008 and 2010.

**[\*9]**  B.  *Respondent's Argument*

Respondent argues Mr. Fry had insufficient stock basis to claim the disallowed flowthrough loss. Respondent further argues that because the Frys have consistently characterized the Transfers and the Payments between Crown and CR Maintenance as debt between the two S corporations, they are prohibited from recharacterizing them as equity contributions. Respondent asserts that section 385(c), the duty of consistency, and the doctrine of election prohibit the recharacterization of the Transfers and the Payments from debt to equity as their original characterization was debt. Respondent avers that permitting the Frys to recharacterize the debt as equity would result in prohibited flowthrough losses for them for tax years 2017 and 2018. These tax years are now closed for assessment since the period of limitations has expired. Furthermore, respondent notes that the Frys had the prior opportunity to characterize the Transfers and the Payments as equity when filing their tax returns and preparing their financial documentation, but they elected to treat the Transfers and the Payments as loans.

II.  *Burden of Proof*

In general, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving otherwise. Rule 142(a)(1); *Welch v. Helvering,* 290 U.S. 111, 115 (1933).

The burden of proof may shift to the Commissioner if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the proper tax liability and establishes that he or she complied with the requirements of section 7491(a)(2)(A) and (B) to substantiate items, to maintain required records, and to cooperate with the Commissioner's reasonable requests. I.R.C. § 7491(a)(1) and (2).

Petitioners argue that the burden of proof has shifted to respondent since they claim to have cooperated with all requests for witnesses, documents, information, meetings, and interviews during the examination. Respondent notes that petitioners did not provide all documents requested during the examination and contends therefore that they failed to provide credible evidence sufficient to shift the burden of proof to respondent.

The burden of proof is relevant only where there is equal evidence on both sides. *See Dagres v. Commissioner,* 136 T.C. 263, 276 (2011). The

**[\*10]** resolution of the issues before us is not dependent on which party has the burden of proof, since a preponderance of the evidence standard will be used to resolve all factual issues regardless of which party has the burden. *See* I.R.C. § 7491(a); *Estate of Turner v. Commissioner*, 138 T.C. 306, 309 (2012), *supplementing* T.C. Memo. 2011-209, *supplemented by* 151 T.C. 160 (2018); *Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340. Nevertheless, we do not perceive an evidentiary tie in this case and need not determine whether petitioners have successfully shifted the burden of proof to respondent.

III.  *Pleadings*

The purpose of pleadings is "to give the parties and the Court fair notice of the matters in controversy and the basis for the parties' respective positions." Rule 31(a). Rule 36(b) provides that "the answer must contain a clear and concise statement of every ground, together with the facts in support thereof, on which the Commissioner relies and has the burden of proof, as well as any special matters as required by Rule 39."

Whether an issue not raised in the pleadings will nonetheless be considered is a matter within the Court's discretion, taking into account the risk of prejudice or unfair surprise to the opposing party. *Smalley v. Commissioner*, 116 T.C. 450, 456 (2001); *Ware v. Commissioner*, 92 T.C. 1267, 1268 (1989) (allowing a party to raise a new issue for the first time on brief). Prejudice or unfair surprise arises when the opposing party would be prevented from presenting evidence that might have been offered if the issue had been timely raised. *See Smalley*, 116 T.C. at 456–57; *Pagel, Inc. v. Commissioner*, 91 T.C. 200, 211–12 (1988), *aff'd*, 905 F.2d 1190 (8th Cir. 1990).

Petitioners argue that it is inappropriate to allow respondent to present a new argument, i.e., section 385(c), since he failed to present it in his initial Answer. We disagree and find that petitioners are not prejudiced or subject to unfair surprise as a result of respondent's introduction of this argument. Moreover, respondent timely filed a Pretrial Memorandum setting forth the issues and relevant law, which included the section 385(c) argument. Petitioners were fairly apprised of respondent's intent to propose this argument, and they had an opportunity at trial and on brief to address it. Furthermore, petitioners have used briefing to address respondent's argument regarding section 385(c). Therefore, we will consider respondent's section 385(c)

**[\*11]** argument and decline to rest our disposition of this issue solely on the ground of improper pleading. We will consider the underlying merits of respondent's argument that section 385(c) precludes the characterization of the Transfers and the Payments as equity.

IV.    *Characterization of Debt Versus Equity*

The determination as to whether a particular interest is characterized as debt or equity is generally made with reference to various factors that indicate the economic substance of a transaction. *See* I.R.C. § 385(b) (setting forth five factors that may be included in any regulations prescribed by the Secretary to determine, with respect to a particular factual situation, whether a debtor-creditor relationship exists or a corporation-shareholder relationship exists); *see also Hardman v. United States*, 827 F.2d 1409, 1412 (9th Cir. 1987) (setting forth the 11 factors that the U.S. Court of Appeals for the Ninth Circuit applies to characterize a taxpayer's interest in a corporation). Absent stipulation to the contrary pursuant to section 7482(b)(2), appeal of this case would lie to the Ninth Circuit, and we thus follow its precedent. *See* I.R.C. § 7482(b)(1)(A).

Petitioners ask us to find that the Transfers and the Payments are equity, not debt. Petitioners contend that the Transfers and the Payments were constructive distributions from Crown to Mr. Fry and constructive contributions by Mr. Fry to CR Maintenance. Therefore, petitioners argue that Mr. Fry had sufficient stock basis to allow the Frys to claim the flowthrough losses on their 2013 tax return.

A.    *Section 385*

Crown and CR Maintenance are S corporations taxed in accordance with subchapter S of the Code. *See* I.R.C. §§ 1361–1379. Under section 1371, the provisions of subchapter C of the Code are applicable to S corporations. *See* I.R.C. §§ 301–385. Section 385(a) authorizes the Secretary to prescribe "regulations as may be necessary or appropriate to determine whether an interest in a corporation is to be treated . . . as stock or indebtedness," i.e., equity versus debt. As stated above, section 385(b) sets forth five factors that may be included in any regulations prescribed by the Secretary. Section 385(c) further provides that "[t]he characterization (as of the time of issuance) by the issuer as to whether an interest in a corporation is stock or indebtedness shall be binding on such issuer and on all holders of such interest (but shall not be binding on the Secretary)."

**[\*12]** Respondent argues that section 385(c) should be applied to bind the Frys to their characterization at the time of filing the return for the 2013 tax year and that section 385(c) prohibits the recharacterization of the interest as equity since the Transfers and the Payments were classified by Crown and CR Maintenance as debt on their tax returns and general ledgers. Respondent further argues that the regulations associated with section 385 do not apply in this proceeding. [6]

Petitioners counter with the position that section 385(c) does not apply since there was no formal issuance of an instrument and the substance of the transactions, rather than the form, should control in deciding whether the Transfers and the Payments were equity. Petitioners also argue that section 385(c) has never been applied to S corporations and that the regulations promulgated under section 385 in 2016 exclude S corporations entirely from being affected by section 385.

We agree with petitioners' primary position that section 385(c) does not apply to the facts herein as there was no formal issuance of any instrument evidencing the creation of an interest in stock or equity. The issuance of an interest in debt is typically contained in a promissory note and an equity interest is typically contained in a stock certificate. *Hardman*, 827 F.2d at 1412. No such issuance of a promissory note or a stock certificate occurred here. Thus, on the basis of a plain reading of the statute, we hold section 385(c) inapplicable.[7]

---

[6] Although the regulations under section 385 are not binding on respondent as the regulation in question was promulgated after the relevant tax period, we still find it persuasive. *See Bell v. Commissioner*, 700 F. App'x 654, 656 n.1 (9th Cir. 2017) (acknowledging that while the Secretary promulgated regulations, they apply only for tax years ending on or after January 19, 2017), *aff'g* T.C. Memo. 2015-111; *see also* Treas. Reg. § 1.385-1(f). Treasury confirmed petitioners' argument and undermined respondent's argument when it opined that Congress did not intend for section 385(c) to be applicable to S corporations. *See* Treas. Reg. § 1.385-1(c)(4)(i); T.D. 9897, Preamble, 2020-23 I.R.B. 882, 885. Treasury Regulation § 1.385-1(a) states that the section 385 regulations apply "to determine the treatment of an interest in a corporation as stock or indebtedness . . . in particular factual situations." These factual situations appear to be limited to situations involving a controlled partnership, a domestic corporation that is part of an expanded group, and a disregarded entity. Treas. Reg. § 1.385-1(c). Treasury Regulation § 1.385-1(c)(4) excludes S corporations from the definition of expanded groups.

[7] Moreover, as petitioners correctly note, section 385(c) has never been applied to bind any taxpayer, much less an S corporation, to the initial characterization of an

**[\*13]** B. *Caselaw Factors*

The substance of a transaction, not its form, "controls the characterization of a taxable transaction." *Hardman*, 827 F.2d at 1411 (citing *Gregory v. Helvering*, 293 U.S. 465, 469–70 (1935)). Transfers between related parties are subject to close scrutiny but do not necessarily lack economic substance. *Id.* at 1412. Whether an advance of funds is treated as genuine debt "must be considered in the context of the overall transaction." *Id.* at 1411. The determinative question, applying the relevant caselaw factors, is whether the taxpayer intended to create a debt with a reasonable expectation of repayment, and if so, whether that intent comports in substance with the creation of the debtor-creditor relationship. *Litton Bus. Sys., Inc. v. Commissioner*, 61 T.C. 367, 377 (1973). "The outward form of the transaction is not controlling; rather, characterization depends on the taxpayer's actual intent, as evidenced by the circumstances and conditions of the advance." *Bauer v. Commissioner*, 748 F.2d 1365, 1367–68 (9th Cir. 1984), *rev'g* T.C. Memo. 1983-120.

The Ninth Circuit has identified 11 factors that may be relevant in determining whether a transfer to a corporation by a shareholder is debt or a contribution of capital. *Hardman*, 827 F.2d at 1411–12; *A.R. Lantz Co. v. United States*, 424 F.2d 1330, 1333 (9th Cir. 1970). No one factor is controlling or decisive, and the Ninth Circuit directs us to consider the "particular circumstances of each case." *Hardman*, 827 F.2d at 1412. "The object of the inquiry is not to count factors, but to evaluate them." *Id.* (quoting *Tyler v. Tomlinson*, 414 F.2d 844, 848 (5th Cir. 1969)). The taxpayer bears the burden of establishing that the interest should be characterized as debt or equity. *Bauer v. Commissioner*, 748 F.2d at 1368 (citing *O.H. Kruse Grain & Milling v. Commissioner*, 279 F.2d 123, 125 (9th Cir. 1960), *aff'g* T.C. Memo. 1959-110).

---

interest as equity or debt, and despite its enactment in 1992, this section has been cited by a court on only one other occasion and merely in passing. *See Bell v. Commissioner*, 700 F. App'x 654, 655 (9th Cir. 2017), *aff'g* T.C. Memo. 2015-111. Thus, we will decline to apply it here. The ultimate test of the characterization of a transaction is not necessarily the original intent of the parties. *United States v. Uneco, Inc.* (*In re Uneco, Inc.*), 532 F.2d 1204, 1207 (8th Cir. 1976); *Cuyuna Realty Co. v. United States*, 382 F.2d 298, 301 (Ct. Cl. 1967). The Court should inquire for each tax year as to the characterization of a transaction as equity or indebtedness. *Cuyuna Realty Co.*, 382 F.2d at 301. We hold that the determination of an interest as equity or debt will be based on the overall transaction in the context of the relevant factors, rather than the initial characterization of the interest at the time of the filing of the 2013 tax return.

**[\*14]** The Ninth Circuit in *Hardman* identified the following factors as potentially relevant to the debt-vs-equity inquiry: (1) the names given to the certificates evidencing the debt; (2) the presence or absence of a fixed maturity date; (3) the source of the payments; (4) the right to enforce payments of principal and interest; (5) whether the advances increase participation in management; (6) whether the "lender" has a status equal or inferior to that of regular creditors; (7) objective indicators of the parties' intent; (8) whether the capital structure of the "borrower" is thin or adequate; (9) the extent to which the funds advanced are proportional to the shareholder's capital interest; (10) the extent to which interest payments come from "dividend" money; and (11) the ability of the "borrower" to obtain loans from outside lending institutions. *See Hardman*, 827 F.2d at 1412; *NA Gen. P'ship & Subs. v. Commissioner*, T.C. Memo. 2012-172, 2012 WL 2344719, at \*6.

1. *Names Given to the Certificates Evidencing the Indebtedness*

The issuance of a debt instrument such as a promissory note indicates debt, and the issuance of an equity instrument such as a stock certificate indicates an equity contribution. *Hardman*, 827 F.2d at 1412; *NA Gen. P'ship & Subs. v. Commissioner*, 2012 WL 2344719, at \*6. If the document at issue includes wording typically contained in a promissory note and does not include wording typically contained in a stock certificate, then this factor will weigh in favor of a finding that the transaction at issue was debt rather than equity. *Hardman,* 827 F.2d at 1412. This factor does not squarely fit in the context of an S corporation since there is generally no issuance of stock for capital; rather, capital is accounted for internally when contributed (or retained) by the shareholders as basis. *See generally* I.R.C §§ 1366 and 1367.

We find this factor to be neutral since there was no creation of a formal debt instrument indicating indebtedness; nor was there recognition of a capital contribution by CR Maintenance.

2. *The Presence or Absence of a Maturity Date*

A fixed maturity date is evidence that a debt exists because it requires fulfillment of the financial obligation at a specific time. *NA Gen. P'ship & Subs. v. Commissioner*, 2012 WL 2344719, at \*6. The lack of a fixed maturity date indicates that payment is linked to the success of the business and is evidence of an equity interest. *Hardman*, 827 F.2d at 1413. Similarly, an advance made with a fixed maturity date that has

**[\*15]** been postponed for a prolonged period suggests that "the nominal lender does not intend to require repayment and that the transfers are equity." *Laidlaw Transp., Inc. v. Commissioner*, T.C. Memo. 1998-232, 1998 WL 345528, at \*24. Here, CR Maintenance intended to make repayments to Mr. Fry if CR Maintenance was profitable; therefore, this factor weighs in favor of equity as the record shows that repayments were dependent on the success of CR Maintenance and not due at any fixed time.

### 3. *The Source of Payments*

Payments that depend on earnings or come from a restricted source indicate an equity interest. *Hardman*, 827 F.2d at 1413; *NA Gen. P'ship & Subs. v. Commissioner*, 2012 WL 2344719, at \*7. A true lender is concerned with a reliable return on his investment in the form of interest and repayment of principal. *See Curry v. United States*, 396 F.2d 630, 634 (5th Cir. 1968). If timely payments to the alleged lender are not made, or if they can plausibly be made only out of future earnings, an inference arises that the advances were contributions to capital. *Hardman*, 827 F.2d at 1413; *Am. Offshore, Inc. v. Commissioner*, 97 T.C. 579, 602 (1991). When repayment is not dependent upon earnings, the interest is more likely to be characterized as a loan. *Am. Offshore, Inc.*, 97 T.C. at 602. Following the withdrawal of the contract with the City of Los Angeles in 2011, CR Maintenance ceased to be profitable. At trial Mr. Richardson testified that CR Maintenance would have repaid the Transfers and the Payments if CR Maintenance had become profitable. Therefore, the repayment of the Transfers and the Payments by CR Maintenance was conditioned on the future profitability of CR Maintenance. Consequently, this factor weighs in favor of equity.

### 4. *The Right to Enforce the Payment of Principal and Interest*

The right to enforce payment of principal and interest is evidence of debt. *Hardman*, 827 F.2d at 1413; *Bell*, T.C. Memo. 2015-111, at \*13; *NA Gen. P'ship & Subs. v. Commissioner*, 2012 WL 2344719, at \*8. A lender's failure to take any of the "customary steps" to ensure repayment, such as obtaining a security interest, despite an enforceable right to repayment, supports a conclusion of equity. *Lane v. United States* (*In re Lane*), 742 F.2d 1311, 1317 (11th Cir. 1984); *Allen v. Commissioner*, T.C. Memo. 2023-86, at \*18. Nevertheless, the lack of a security interest in connection with a promise to repay is indicative of an equity interest, but it may be less important where the transaction

**[*16]** is between related parties. *See, e.g.*, *Bell*, T.C. Memo. 2015-111, at *13; *Am. Underwriters, Inc. v. Commissioner*, T.C. Memo. 1996-548, 1996 WL 726365, at *8.

As of December 31, 2013, CR Maintenance had failed to repay $9,650,662 to Mr. Fry or Crown. The record does not indicate that Mr. Fry ever made a written request to demand payment from CR Maintenance on Crown's behalf, nor was interest collected from CR Maintenance on the Transfers and the Payments. Furthermore, Crown never obtained a security interest. Thus, this factor weighs in favor of equity.

### 5. *Participation in Management*

If a taxpayer's advances to a corporation entitle him to greater participation in its management, the advances are more likely to be treated as equity. *Hardman*, 827 F.2d at 1413; *Am. Offshore, Inc.*, 97 T.C. at 603. Both Crown and CR Maintenance had only one shareholder at the time of the relevant transactions, Mr. Fry, and his ownership interest never changed as a result of the Transfers and the Payments. Accordingly, this factor is neutral.

### 6. *A Status Equal to or Inferior to That of Regular Corporate Creditors*

If a shareholder's rights to repayment of principal and interest are subordinated to the rights of regular creditors, then the shareholder's advances are generally indicative of an equity interest. *Hardman*, 827 F.2d at 1413; *Am. Offshore, Inc.*, 97 T.C. at 603. Even absent an explicit subordination clause, the failure to demand timely repayment or to take collateral effectively subordinates the alleged debt to the rights of other creditors, who may receive payment or foreclose on their security in the interim. *Am. Offshore, Inc.*, 97 T.C. at 603.

On the basis of the record before us, we conclude that Crown's right to repayment was subordinated to the rights of regular creditors. Mr. Fry and Crown never demanded payment from CR Maintenance, and repayment of the Transfers and the Payments was subordinated to the claims of CR Maintenance's creditors. The Transfers and the Payments were necessary for CR Maintenance to continue operating and pay its creditors and operational expenses including fuel, wages, payroll taxes, workers' compensation insurance, and employee benefits. There is no evidence in the record to suggest that Crown was repaid before other creditors. Accordingly, this factor weighs in favor of equity.

**[*17]**        7.        *The Intent of the Parties*

In considering this factor we examine whether the parties to the transaction intended the interest to be debt or equity. *Hardman*, 827 F.2d at 1413. The Court will look at the objective evidence of whether the parties intended to create a "definite obligation, repayable in any event." *See id.*; *NA Gen. P'ship & Subs. v. Commissioner*, 2012 WL 2344719, at *9; *Hewlett-Packard Co. & Consol. Subs. v. Commissioner*, T.C. Memo. 2012-135, 2012 WL 1673643, at *28, *aff'd*, 875 F.3d 494 (9th Cir. 2017); *Am. Underwriters, Inc. v. Commissioner*, 1996 WL 726365, at *9. The intent at the time of the creation of the interest is persuasive, but the Court uses all 11 factors to determine the "true intent" concerning the creation of the interest. *Am. Underwriters, Inc. v. Commissioner*, 1996 WL 726365, at *9.

When the Transfers and the Payments were initially structured, it is likely that Mr. Fry, Crown, and CR Maintenance intended them to be debt. CR Maintenance accounted for the transfers from Crown as a "Loan Payable" in their general ledger liability from 2010 through 2014. From 2006 through 2013, CR Maintenance accounted for the Payments paid by Crown as "Due to Crown" in another general ledger liability account. From 2010 to 2017, CR Maintenance documented the Transfers and the Payments as liabilities between CR Maintenance and Crown but did not document the additional contributed capital or loans from Mr. Fry on its 2009 to 2019 financial documents. Crown accounted for the expenses it paid for CR Maintenance, from 2006 through 2013, as "Due from CR [Maintenance]." Crown documented the Transfers and the Payments as liabilities between Crown and CR Maintenance from 2010 through 2017. From 2010 through 2020, CR Maintenance reported the Transfers and the Payments as a balance due to Crown on its tax returns and characterized them as indebtedness on the return. CR Maintenance did not report Mr. Fry's additional capital contributions on the returns filed between 2009 and 2019. Crown reported the Transfers and the Payments as liabilities due from CR Maintenance on its tax returns from 2010 through 2020 and characterized them as indebtedness. Thus, this factor weighs in favor of indebtedness as the ledgers and tax returns of the parties seemed to indicate that the parties intended this to be classified as debt at the time of creation.

**[*18]** 8. *Thin or Adequate Capitalization*

The purpose of examining the alleged borrower's debt-to-equity ratio is to determine whether it is so thinly capitalized that it would be unable to repay the debt if its financial condition worsened. *Bauer v. Commissioner*, 748 F.2d at 1369. Thin capitalization tends to indicate that a transaction is a capital contribution. *Hardman*, 827 F.2d at 1414. A corporation's debt-to-equity ratio is determined by comparing all of its liabilities to the shareholders' equity. *Am. Underwriters, Inc. v. Commissioner*, 1996 WL 726365, at *9.

At trial Mr. Richardson testified that on the basis of the losses of CR Maintenance at the end of 2013, CR Maintenance would not have been able to repay any loans from a commercial lender. Furthermore, after 2011 CR Maintenance was losing between $5 and $7 million per year. This suggests that CR Maintenance was undercapitalized and would not have been able to repay debts. However, in the absence of financial statements, it is not possible to calculate debt-to-equity ratios for the 2013 tax year. Thus, this factor is neutral.

9. *Identity of Interest Between Creditor and Stockholder*

Advances made by shareholders in proportion to their stock ownership indicate capital contributions. *Hardman*, 827 F.2d at 1414; *NA Gen. P'ship & Subs. v. Commissioner*, 2012 WL 2344719, at *13; *Am. Underwriters, Inc. v. Commissioner*, 1996 WL 726365, at *10. Where a stockholder owns "debt" in the same proportion to which he holds stock in the corporation, the characterization of his advances as "debt" may be suspect. *Bauer v. Commissioner*, 748 F.2d at 1370. This Court has previously determined that where the same family controlled the issuing and borrowing entities, the interests between borrower and lender were "significantly intertwined" and the factor weighed in favor of equity. *Allen*, T.C. Memo. 2023-86, at *25–26 (quoting *Tribune Media Co. v. Commissioner*, T.C. Memo. 2021-122, at *79–80).

Mr. Fry was the sole shareholder of both CR Maintenance and Crown. Each month Mr. Fry reviewed the financial position of Crown and CR Maintenance and directed Crown to transfer sufficient funds to CR Maintenance to allow CR Maintenance to continue operating. As the interests of Mr. Fry, Crown, and CR Maintenance were "significantly intertwined," there was likely an identity of interest. Accordingly, this factor weighs in favor of equity.

**[*19]**       10.      *Extent to Which Interest Payments Come from "Dividend" Money*

A true lender is concerned with reliable payments of interest. *Estate of Mixon v. United States*, 464 F.2d 394, 409 (5th Cir. 1972). A lack of interest payments and the alleged debtor's lack of ability to make them suggests that the party who advanced funds is looking to the corporation's future earnings to achieve a return on his investment, which is indicative of equity. *Am. Offshore, Inc.*, 97 T.C. at 605. This factor is effectively the same as the third *Hardman* factor. As noted under the third factor, there was no expectation that CR Maintenance would make interest payments to Crown, nor did Crown make such a demand. Thus, like the third factor, this factor favors equity.

11.      *The Ability of the Corporation to Obtain Loans from Outside Lending Institutions*

If the corporation is able to obtain funds from outside sources on substantially the same terms as those imposed by the payor of the advance, an inference arises that the advance may be debt. *Hardman*, 827 F.2d at 1414; *Estate of Mixon*, 464 F.2d at 410. Evidence that the corporation would not have been able to obtain a loan from an independent source indicates equity. *Hardman*, 827 F.2d at 1414. Where there is no evidence that a taxpayer was unsuccessful in attempts to obtain independent financing, the Court will consider this factor neutral. *Am. Offshore, Inc.*, 97 T.C. at 605–06.

At trial Mr. Richardson testified that on the basis of the losses of CR Maintenance at the end of 2013, no lender would have loaned $36 million to CR Maintenance to replace the Transfers and the Payments from Crown. Mr. Richardson additionally testified that CR Maintenance had never attempted to get a commercial loan outside of the Transfers and the Payments from Crown. However, aside from Mr. Richardson's testimony, petitioners presented no evidence regarding the credit worthiness of CR Maintenance, Crown, or Mr. Fry. Accordingly, we find this factor to be neutral.

12.      *Outcome of the* Hardman *Factors*

Of the 11 factors listed in *Hardman*, 4 are neutral, 6 favor equity, and 1 favors debt. After weighing the factors in the context of this case we conclude it is more likely than not that the Transfers and the Payments in question do not constitute true indebtedness.

**[\*20]** Next, we must determine whether the transactions in question can be recharacterized as constructive distributions from Crown to its shareholder, Mr. Fry, followed by contributions of capital to CR Maintenance.

## C.   *Constructive Distribution/Contribution*

A distribution[8] need not be formally declared or even intended by a corporation to be deemed a constructive distribution. *See Noble v. Commissioner*, 368 F.2d 439, 442–43 (9th Cir. 1966), *aff'g* T.C. Memo. 1965-84. "It is well established that transfers between related corporations may result in constructive dividends to a common shareholder." *Benson v. Commissioner*, T.C. Memo. 2004-272, 2004 WL 2698858, at \*17 (quoting *Speer v. Commissioner*, T.C. Memo. 1996-323, 1996 WL 39398, at \*7), *supplemented by* T.C. Memo. 2006-55, *aff'd*, 560 F.3d 1133 (9th Cir. 2009). "A greater potential for constructive dividends \* \* \* exists in closely held corporations where dealings between stockholders and the corporation are commonly characterized by informality." *Id.* (quoting *Zhadanov v. Commissioner*, T.C. Memo. 2002-104, 2002 WL 731708, at \*11).

Under Ninth Circuit caselaw, a constructive dividend occurs where a two-part test is met: (1) the expenditures do not give rise to a deduction on behalf of the distributing corporation and (2) the expenditures create "economic gain, benefit, or income" to the shareholder. *See P.R. Farms, Inc. v. Commissioner*, 820 F.2d 1084, 1088 (9th Cir. 1987) (quoting *Meridian Wood Prods. Co. v. United States,* 725 F.2d 1183, 1191 (9th Cir. 1984)), *aff'g* T.C. Memo. 1984-549; *Magnon v. Commissioner*, 73 T.C. 980, 993–94 (1980). We conclude both prongs of this two-part test are met.

The crucial determination of whether a constructive dividend exists turns on the question of whether the distribution was primarily for the benefit of the shareholder. *Hood v. Commissioner,* 115 T.C. 172, 179–80 (2000). A showing that the corporation, rather than the shareholder, was the primary beneficiary of a distribution is required to avoid constructive distribution treatment. *See id.* at 181. Whether the shareholder primarily benefited from the distribution is a question of

---

[8] The Court uses the term "constructive distribution" to describe what our caselaw has sometimes referred to as a "constructive dividend." We use the terms interchangeably here because of CR Maintenance and Crown's status as S corporations.

[*21] fact. *Coastal Heart Med. Grp., Inc. v. Commissioner*, T.C. Memo. 2015-84, at *18.

"Generally, a constructive distribution occurs when corporate assets are diverted to or for the benefit of a shareholder without adequate consideration for the diversion." *CTM Constr., Inc. v. Commissioner*, T.C. Memo. 1988-590, 1988 Tax Ct. Memo LEXIS 619, at *11 (citing *Sammons v. Commissioner*, 472 F.2d 449 (5th Cir. 1972), *aff'g in part, rev'g in part, and remanding* T.C. Memo. 1971-145). A transfer between related corporations can be a constructive dividend to common shareholders even if those shareholders do not personally receive the funds. *See, e.g.*, *Benson v. Commissioner*, 2004 WL 2698858, at *18–22 (finding payments for purported royalties and nonexistent services between related entities were a constructive dividend); *Shedd v. Commissioner*, T.C. Memo. 2000-292, 2000 WL 1337177, at *6–7 (finding advance of funds between shareholder's entities was a constructive dividend); *see also Stinnett's Pontiac Serv., Inc. v. Commissioner*, 730 F.2d 634, 641 (11th Cir. 1984), *aff'g* T.C. Memo. 1982-314.

In order to meet the second prong of the Ninth Circuit's test, the shareholder must receive an actual, direct benefit. *Stinnett's Pontiac Service, Inc. v. Commissioner*, 730 F.2d at 641; *Gilbert v. Commissioner*, 74 T.C. 60, 67–69 (1980); *see also Povolny Grp., Inc. v. Commissioner*, T.C. Memo. 2018-37, at *14 (finding that where there was no discernable business reason to make a transfer between related entities, as there was no expectation of interest or repayment, the primary benefit was to the shareholder because it reduced the liabilities of his other entities); *J.F. Stevenhagen Co. v. Commissioner*, T.C. Memo. 1975-198, 1975 Tax Ct. Memo LEXIS 175, at *23 (finding that where advances were made from one corporation to another to further the latter's business as a "viable and profitable corporation," they constituted a primary benefit to the 50% shareholder rather than a business purpose), *aff'd*, 551 F.2d 106 (6th Cir. 1977).

Petitioners argue that the second prong is met since the Transfers and the Payments primarily benefited Mr. Fry. The Transfers and the Payments allowed CR Maintenance to continue operating, reduced the need for Mr. Fry to continue CR Maintenance's operations with his personal funds, and allowed him to continue collecting salary and rent from CR Maintenance. Petitioners further argue that because of the interlinked business operations of CR Maintenance and Crown, had CR Maintenance failed, Crown would not have been profitable.

**[\*22]** We agree with petitioners that the Transfers and the Payments primarily benefited Mr. Fry. There was no discernable business reason for Crown to make the Transfers and the Payments, which is in accordance with our finding of no true expectation of interest or timely repayment. The Transfers and the Payments directly benefited Mr. Fry since it allowed his other business entity, CR Maintenance, to continue operations. At trial Mr. Richardson testified that Mr. Fry treated Crown and CR Maintenance "like his baby" and he wanted to ensure that both continued operating. Thus, we find that petitioners have shown that the Transfers and the Payments were for the primary benefit of Mr. Fry.

The first prong of the Ninth Circuit test requires that the expenditures not give rise to a deduction on behalf of the distributing corporation. *P.R. Farms, Inc. v. Commissioner*, 820 F.2d at 1088. Under this prong the Court seeks to determine whether some benefit existed for the corporation to make the distribution. The Court has found that a distribution was made for the benefit of the corporation when it claimed a deduction as a result of the distribution. *See Benson v. Commissioner*, 2004 WL 2698858, at \*18. As discussed above, there was no discernable business reason for or business deduction attributable to Crown's Transfers. And respondent does not dispute that the Payments were business deductions attributable to CR Maintenance, not Crown.

We find that both prongs of the constructive dividend test are satisfied as the constructive distributions were made primarily for Mr. Fry's benefit. Accordingly, we conclude that the Transfers and the Payments constituted constructive distributions from Crown to Mr. Fry, followed by constructive contributions from Mr. Fry to CR Maintenance.

V. *Mr. Fry's Basis*

Subchapter S corporations are flowthrough entities. A shareholder in an S corporation is entitled to deduct his share of entity level losses in accordance with the flowthrough rules of subchapter S. *See* I.R.C. § 1366(a). Section 1366(d)(1) limits the amount of losses and deductions the shareholder may deduct as not exceeding the sum of the shareholder's adjusted basis in his stock and the shareholder's adjusted basis in indebtedness of the S corporation to the shareholder.

Respondent argues that Mr. Fry has insufficient stock basis to claim the flowthrough loss of $4,733,675 for the 2013 tax year. Petitioners argue that the Transfers and the Payments, when reclassified as deemed distributions from Crown to Mr. Fry and deemed

[*23] capital contributions from Mr. Fry to CR Maintenance, provide additional basis in CR Maintenance to claim these losses.

The parties agree that at the end of 2013, Mr. Fry's debt basis in CR Maintenance was $1,276,231 and his stock basis was $2,438. At the end of 2013 Mr. Fry's debt basis in Crown was $42,724,064 and his stock basis was $584,500. As noted above, the Court agrees with petitioners' contentions that the Transfers and the Payments in question were deemed distributions from Crown to Mr. Fry followed by deemed capital contributions from Mr. Fry to CR Maintenance. The record reflects adequate basis in Crown; however, this calculation is before the Transfers and the Payments in question are recharacterized as distributions from Crown to Mr. Fry.

The record contains insufficient information for the Court to recalculate Mr. Fry's adjusted bases in CR Maintenance and Crown. Accordingly, we instruct the parties to calculate Mr. Fry's bases in CR Maintenance and Crown beginning in 2013 through 2020, in the light of this Court's decision, pursuant to Rule 155. This calculation should also be used to determine the appropriate amount of flowthrough loss the Frys are entitled to for tax year 2013 and determine the harm (if any) facing respondent, which is addressed below.

VI.     *Harm to Respondent*

Respondent argues that if the Transfers and the Payments from Crown to CR Maintenance are recharacterized as distributions followed by contributions, Mr. Fry would have had a zero basis in Crown by the end of 2017, resulting in an insufficient basis for Mr. Fry to claim losses in subsequent years from Crown. Respondent alleges harm because of the closed period of limitations precluding him from examining the tax returns of Crown, CR Maintenance, and the Frys. On their 2017 and 2018 tax returns the Frys reported losses from Crown of $712,495 and $411,577, respectively. Respondent argues that allowing the Frys to recharacterize the debt as equity would let them claim flowthrough losses on their tax returns that they were otherwise ineligible for. At trial respondent called Revenue Agent (RA) Lydia Park, CPA, who prepared a spreadsheet reflecting how Mr. Fry's basis in Crown goes below zero in 2017 and a financial harm to respondent, should the Frys

**[\*24]** be permitted to reclassify both the Transfers and the Payments as equity in CR Maintenance.[9]

Petitioners dispute respondent's argument of harm by contending that the basis calculations respondent presented and relied upon to demonstrate that the distributions from Crown beginning in 2017, purportedly in excess of Mr. Fry's basis in Crown, were not actual distributions. Rather, petitioners contend that these adjustments were merely "accounting entries, not economic transactions." Petitioners argue that Mr. Margolis adjusted Crown's account to correct these incorrect prior characterizations of the Transfers and the Payments as "due from" CR Maintenance on Crown's balance sheet and returns. Mr. Margolis "wrote down" the purported loans from CR Maintenance as they were incorrectly classified as assets on Crown's balance sheet thereby reducing Crown's shareholder equity. On Form 1120S, this reduction appears as a "distribution," but no such distribution actually occurred as Crown lacked sufficient cash and assets beginning in 2017 to make the distributions alleged to have occurred and never deducted any interest on their returns. At trial Mr. Margolis testified that he performed the adjustment to "offset between [CR Maintenance] and Crown exactly everything that [CR Maintenance] owed Crown" for 2017 through 2020.

We find the rebuttal testimony of Mr. Margolis compelling and sufficient to dispute respondent's calculations reflecting an alleged financial harm. Therefore, and as found above, the parties will submit revised basis calculations, pursuant to Rule 155, reflecting Mr. Fry's bases in CR Maintenance and Crown and confirming adequate bases remain in both entities to support the positions claimed by the Frys with respect to the closed tax years.[10]

A.   *Whipsaw*

This Court has allowed the Commissioner "the right to make inconsistent assessments so as to protect the public fisc and 'insure against a potential "whipsaw" effect.'" *Gerardo v. Commissioner*, 552

---

[9] The foregoing basis dispute and cited harm (based on respondent's calculations) appears to begin in 2016 with the distribution of some $39 million reported on the Frys' Schedule K–1.

[10] The goal of this basis calculation should be to show that Mr. Fry held adequate bases in CR Maintenance and Crown to claim the flowthrough loss at issue in 2013, as well as the future positions claimed by the Frys for subsequent tax years that are now closed to audit and would result in harm to respondent.

[*25] F.2d 549, 555 (3d Cir. 1977) (quoting *Cannon v. Commissioner*, 533 F.2d 959, 962 (5th Cir. 1976) (Clark, J., dissenting), *aff'g* T.C. Memo. 1974-219), *aff'g in part, rev'g in part, and remanding* T.C. Memo. 1975-341. Generally, whipsaw issues arise where "both parties to a taxable event avoid taxation by taking inconsistent tax reporting positions for the same transaction." *United States v. Daum*, 968 F. Supp. 1037, 1043 (W.D. Pa. 1997); *Maggie Mgt. Co. v. Commissioner*, 108 T.C. 430, 446 (1997). The Commissioner is harmed in such a whipsaw event because the parties take inconsistent approaches and receive different tax benefits. *Daum*, 968 F. Supp. at 1043. Often, one party to the transaction claims taxation based on the form, and another party to the transaction claims taxation based on the substance. *See Comdisco Inc. v. United States*, 756 F.2d 569, 578 (7th Cir. 1985); *Estate of Durkin v. Commissioner*, 99 T.C. 561, 575 (1992).

Respondent argues that one of the principal purposes behind the enactment of section 385(c) is to bind issuers to their initial characterizations in order to prevent whipsaw. In making this argument respondent quotes a report from the Committee on Ways and Means of the U.S. House of Representatives:

> It has come to the attention of the committee that certain issuers and holders may be taking inconsistent positions with respect to the characterization of a corporate instrument as debt or equity. For example, a corporate issuer may designate an instrument as debt and deduct as interest the amounts paid on the instrument, while a corporate holder may treat the instrument as equity and claim a dividends received deduction . . . .

H.R. Rep. No. 102-716, at 3 (1992).

As noted above, we decline to apply section 385(c) in this case. Section 385(c) has never been applied by this Court (or other courts) to an S corporation seeking to recharacterize debt as equity, and its associated regulations appear to preclude section 385 from applying to S corporations. Regardless of the apparent inapplicability of section 385(c) to S corporations, respondent points out that the purpose behind the enactment of section 385(c) was to prevent whipsaw from taxpayers who deduct interest or claim the dividends received deduction. If Congress sought to prevent whipsaw in the form noted above, then no whipsaw occurred in this case and this argument has no relevance here. CR Maintenance never promised or paid interest on the Transfers and

[*26] the Payments, and Crown never requested interest be paid. Respondent has not introduced any evidence that Crown or CR Maintenance deducted interest. Furthermore, the Frys, as individuals, would not have been eligible to claim the dividends received deduction under section 243. Moreover, S corporations do not typically issue dividends to shareholders, and there is no evidence that Crown or CR Maintenance ever issued any. Under respondent's own argument, the whipsaw Congress sought to prevent in enacting section 385(c) never occurred. The question before us is not as much whether the Frys took inconsistent tax reporting positions. Rather, the more precise question is whether the Transfers and the Payments from Crown are properly reclassified as equity, creating sufficient basis in CR Maintenance for the losses the Frys claimed for 2013.[11] Accordingly, we decline to apply the whipsaw doctrine in this case.

B.     *Duty of Consistency*

The Ninth Circuit has held that for the duty of consistency to apply, the following elements must exist: (1) a representation or report by the taxpayer, (2) reliance by the Commissioner, and (3) an attempt by the taxpayer after the period of limitations has run to change the previous representation or to recharacterize the situation in such a way as to harm the Commissioner. *Estate of Ashman v. Commissioner*, 231 F.3d 541, 545 (9th Cir. 2000), *aff'g* T.C. Memo. 1998-145, 1998 WL 188936. If all three elements are present, the Commissioner may act as if the previous representation, on which he relied, continues to be true, even if it is not. *Id.* The taxpayer is estopped to assert the contrary. *Id.*

The duty of consistency is an affirmative defense. *See Squeri v. Commissioner*, T.C. Memo. 2016-116, at *10; *Estate of Ashman v. Commissioner*, 1998 WL 188936, at *2. Therefore, the party asserting the duty of consistency bears the burden of proving that it applies; thus, respondent bears the burden here. *See* Rule 142(a). Respondent properly pleaded the duty of consistency in filing an Amended Answer, wherein the duty of consistency was asserted as an affirmative defense.

---

[11] To be clear, we do not intend to permit the Frys to take a tax benefit from a flowthrough loss in CR Maintenance that would undermine or otherwise be inconsistent with the prior tax reporting positions taken by Crown. We are under the impression, notwithstanding the recharacterization of the Transfers and the Payments, that Mr. Fry would still hold a sufficient basis in Crown.

**[*27]**     1.     *Representation by the Taxpayer*

In applying the first element of the duty of consistency, the Ninth Circuit requires that a taxpayer made a representation of fact or reported an item for tax purposes. *Estate of Letts v. Commissioner*, 109 T.C. 290, 299 (1997). A taxpayer's treatment of an item on a return can be a representation that facts exist which are consistent with how the taxpayer reports the item on the return. *Id.* at 299–300. Here, Crown and CR Maintenance made clear representations on their tax returns that the Transfers and the Payments between Crown and CR Maintenance were indebtedness. This element of the duty of consistency has been met.

2.     *Reliance by the Commissioner*

The second element of the duty of consistency is reliance by the Commissioner on the taxpayer's representation, which occurs where a taxpayer's return is accepted as filed and examination of the return is not required. *Arberg v. Commissioner*, T.C. Memo. 2007-244, 2007 WL 2416230, at *13. The Commissioner may rely on a presumption of correctness of a return or report that is given to the Commissioner under penalties of perjury. *Estate of Letts*, 109 T.C. at 301. Here, respondent relied upon petitioners' representation that the interest at issue was debt rather than equity and allowed the period of limitations to expire for subsequent tax years for the returns of the Frys, Crown, and CR Maintenance. This element of the duty of consistency has been met.

3.     *Recharacterization by the Taxpayer Resulting in Harm to the Commissioner*

The third element of the duty of consistency requires an attempt by the taxpayer, after the period of limitations has expired, to change the previous representation or to recharacterize the situation in such a way as to harm the Commissioner. Courts have previously found that this element was met in cases where allowing the taxpayers to recharacterize a previous representation would result in significant tax avoidance as a result of the closed period of limitations. *See Estate of Ashman v. Commissioner*, 231 F.3d at 546 (allowing a taxpayer to recharacterize her previous representation would have resulted in "$100,502.21 tax free by misleading [the Commissioner]"); *Squeri*, T.C. Memo. 2016-116, at *13 ("[A]llowing [the taxpayers] to recharacterize their income . . . would allow [them] to avoid tax on $1,634,720."). The duty of consistency was created to avoid "tax gamesmanship" where "the

**[*28]** Commissioner can no longer collect the tax deficiency occasioned by [the taxpayers'] turnabout." *Janis v. Commissioner*, 461 F.3d 1080, 1087 (9th Cir. 2006), *aff'g* T.C. Memo. 2004-117. This Court has declined to apply the duty of consistency in cases where a taxpayer did not receive any benefit and the Commissioner did not suffer any detriment. *Cleo Perfume, Inc. v. Commissioner*, T.C. Memo. 1998-155, 1998 WL 201761, at *5.

As he pleads the duty of consistency as an affirmative defense, respondent bears the burden of proving that the duty of consistency applies here. Respondent has not sufficiently demonstrated that he would suffer any harm upon a finding by this Court that the Transfers and the Payments were equity rather than debt. As noted above, at trial and on brief, respondent has not successfully shown that the recharacterization of the Transfers and the Payments would cause him harm.

Respondent repeatedly alleges harm and relies on the spreadsheet created by RA Park which was introduced at trial as Exhibit 102-R purportedly showing distributions in excess of Mr. Fry's basis. Exhibit 102-R was created by RA Park after the Frys did not provide a basis calculation for Mr. Fry in CR Maintenance. At trial RA Park testified that the spreadsheet was created using assets from Schedules L, Balance Sheet per Books, and Schedules K–1 of Crown's tax returns. She testified only as to what information she gleaned from the returns and not as to the nature of the distributions. She further indicated that she did not have information on whether the distribution was a cash or other property distribution or what the source of the distribution was.

In rebuttal Mr. Margolis testified that the distributions on this spreadsheet were in reality accounting "plugs" to the balance sheet, and not actual distributions of cash or property. Mr. Margolis indicated that this occurred for tax years 2017 through 2020. At the conclusion of his rebuttal testimony, respondent had the opportunity to cross-examine Mr. Margolis on this issue but declined to do so.

For these reasons, we conclude that the third element of the duty of consistency has not been met under the facts herein.

C. *Doctrine of Election*

The doctrine of election is an equitable principle that generally precludes a taxpayer who makes a conscious election from revoking or

**[*29]** amending that election without the consent of the Commissioner. *See, e.g., Pac. Nat'l Co. v. Welch,* 304 U.S. 191 (1938). The doctrine consists of the following two elements: (1) there must be a free choice between two or more alternatives and (2) there must be an overt act by the taxpayer communicating the choice to the Commissioner, i.e., a manifestation of choice. *See Grynberg v. Commissioner,* 83 T.C. 255, 261 (1984); *Hodel v. Commissioner,* T.C. Memo. 1996-348, 1996 WL 426845, at *4. We fail to see how this doctrine applies here. Petitioners do not have a "free choice" or election to deem the Transfers or the Payments either debt or equity. Rather, and as detailed above, the characterization of the Transfers and the Payments is based on various factors that indicate the true economic substance of a transaction.

The doctrine of election is often applied in situations where a taxpayer has filed or seeks to file an amended return or is pursuing a suit for refund and seeks to change the treatment of the contested items inconsistently with the treatment of the items on the original return. *Pac. Nat'l Co.,* 304 U.S. 191; *Grynberg,* 83 T.C. 255; *Goldstone v. Commissioner,* 65 T.C. 113, 114 (1975); *Hodel v. Commissioner,* 1996 WL 426845, at *4–5.

This case is not a situation where a taxpayer has filed or seeks to file an amended return or a refund suit treating contested items inconsistently with how the taxpayer previously treated them on the originally filed return.

Moreover, the applications of the doctrine of election by this Court are few and far between. The most recent opinion to cite the doctrine of election determined that the doctrine was inapplicable. *Ag Processing, Inc. v. Commissioner,* 153 T.C. 34, 54–55 (2019). Respondent does not cite any caselaw indicating that the Ninth Circuit has adopted the doctrine of election and would apply it to the facts herein. Accordingly, we decline to apply the doctrine of election to the facts before us.

We are not persuaded by respondent's allegation of whipsaw, nor are we convinced of the applicability of the duty of consistency and the doctrine of election. We decline to bind the Frys to the original characterization of the Transfers and the Payments as debt based on these three arguments. An analysis of the factors under *Hardman* clearly demonstrates that the Transfers and the Payments should have been classified as equity. Furthermore, respondent repeatedly alleges harm but has not shown the Court what specific detriment would befall him. Petitioners have persuasively and successfully rebutted

**[\*30]** respondent's allegation that Mr. Fry received distributions in excess of basis for subsequent tax years. Accordingly, we hold that the Transfers and the Payments were interests in equity rather than genuine indebtedness and the Frys will be eligible for the entire flowthrough loss, provided Rule 155 computations support their claim of adequate bases.

VII.  *Addition to Tax and Accuracy-Related Penalty*

A.    *Addition to Tax*

Section 6651(a)(1) imposes an addition to tax if the taxpayer fails to file an income tax return by the required due date, including any extension of time for filing. The addition to tax under section 6651(a)(1) is imposed on the net amount due, meaning that the amount of tax required to be shown on the return is reduced by the amount of tax paid on or before its due date and allowed as a credit on the return. I.R.C. § 6651(b); Treas. Reg. § 301.6651-1(d). Under section 7491(c), the Commissioner bears the burden of production with respect to the liability of the taxpayer for additions to tax. *See Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). If the Commissioner meets the burden, the taxpayer has the burden of proving that failure to timely file was due to reasonable cause and not willful neglect. *See* I.R.C. § 6651(a)(1); *United States v. Boyle*, 469 U.S. 241, 243 (1985); *Higbee*, 116 T.C. at 447; *Williams v. Commissioner*, T.C. Memo. 2022-7, at \*4. However, "the failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not 'reasonable cause' for a late filing" under this section. *Boyle*, 469 U.S. at 252.

Petitioners have conceded that the return for the 2013 tax year was filed late. The due date for the return was October 15, 2014, but the return was not filed until November 10, 2014. Accordingly, we hold that the Frys are liable for the addition to tax pursuant to section 6651(a)(1) as determined by the amount of unpaid tax, if any, due to respondent following the submission of Rule 155 computations.

B.    *Accuracy-Related Penalty*

Respondent determined that the Frys are liable for an accuracy-related penalty under section 6662(a) and (b)(2) for the 2013 tax year on the basis of a substantial understatement of income tax.

Section 6662(a) and (b)(2) imposes a penalty equal to 20% of the portion of an underpayment of tax required to be shown on a taxpayer's

**[\*31]** return that is attributable to a "substantial understatement of income tax." An understatement of income tax is a "substantial understatement" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. I.R.C. § 6662(d)(1)(A).

The Commissioner bears the burden of production with respect to a penalty imposed on an individual taxpayer under section 6662(a) and is required to present sufficient evidence showing that the penalty is appropriate. *See* I.R.C. § 7491(c); *Higbee*, 116 T.C. at 446–47. This includes showing compliance with the procedural requirements of section 6751(b)(1). *See* I.R.C. § 7491(c); *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1072–74 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020); *Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016).

Section 6751(b)(1) provides that no penalty shall be assessed unless "the initial determination" of such assessment was "personally approved (in writing) by the immediate supervisor of the individual making such determination." The parties stipulated, and we have found, that the accuracy-related penalty for the 2013 tax year was personally approved, in writing, by the RA's immediate acting supervisor, Glenn Hamanaka, on September 10, 2019. Accordingly, respondent has satisfied his burden with regard to the supervisory approval requirement of section 6751(b), and petitioners do not contend otherwise.

Under section 7491(c), respondent has the burden of production with respect to the section 6662(a) penalty. To meet this burden, respondent must produce sufficient evidence indicating that it is appropriate to impose the penalty. *See Higbee*, 116 T.C. at 446. If the Rule 155 computations show an underpayment and a substantial understatement of tax, these computations will satisfy respondent's burden of production under section 7491(c).

A taxpayer may avoid a section 6662(a) penalty by showing that there was reasonable cause for any portion of the underpayment and that the taxpayer acted in good faith. I.R.C. § 6664(c)(1). Reasonable cause requires that the taxpayer has exercised ordinary business care and prudence. *Boyle*, 469 U.S. at 246. Whether a taxpayer acted with reasonable cause and in good faith within the meaning of section 6664(c)(1) is determined on a case-by-case basis, taking into account all relevant facts and circumstances. Treas. Reg. § 1.6664-4(b)(1). The most

**[\*32]** important factor is the extent of the taxpayer's effort to assess his proper tax liability for the year. *Id.*

Where a taxpayer claims reliance on professional advice, section 6664(c) will apply if "the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

As noted above, this Court has previously permitted new issues to be raised for the first time on brief, so long as the opposing party was not subject to prejudice or unfair surprise. *Ware*, 92 T.C. at 1268. Petitioners did not raise the defense of reasonable cause based on reliance on a professional until filing their Answering Briefs. This defense was not raised in petitioners' Pretrial Memorandum, at trial, or in petitioners' Opening Brief. We find that allowing petitioners to assert this argument for the first time in their Answering Brief would subject respondent to prejudice. Accordingly, we conclude that petitioners are not entitled to the reasonable cause defense to the section 6662(a) accuracy-related penalty and sustain respondent's determination. Therefore, we hold that the Frys are liable for a section 6662(a) penalty to the extent the Rule 155 computations show there is an underpayment of tax attributable to a substantial understatement of income tax.

VIII. *Conclusion*

We have considered all of the arguments that the parties made, and to the extent they are not addressed herein, we find the arguments to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*